2021 IL App (1st) 182371-U
Order filed: March 19, 2021

FIRST DISTRICT
FIFTH DIVISION

No. 1-18-2371

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 17 CR 5533 |
| | ) | |
| KENNETH THOMPSON, | ) | Honorable |
| | ) | Maura Slattery Boyle, |
| Defendant-Appellant. | ) | Judge, presiding |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirmed defendant's conviction and sentence for aggravated battery causing great bodily harm, finding that the State proved him guilty beyond a reasonable doubt, that his counsel provided effective assistance, and that his nine-year sentence was not an abuse of discretion. We reduced his MSR term to one year.

¶ 2    Following a bench trial, the circuit court convicted defendant of aggravated battery causing great bodily harm, aggravated battery causing permanent disfigurement, and aggravated battery using a deadly weapon. The court sentenced defendant to nine years' imprisonment and two years of mandatory supervised release (MSR) for aggravated battery causing great bodily harm. The

court merged the aggravated battery counts alleging permanent disfigurement and use of a deadly weapon into the count alleging great bodily harm and as a result of the merger did not impose sentences on those permanent disfigurement and deadly weapon counts. On appeal, defendant contends that: (1) the State failed to prove him guilty beyond a reasonable doubt of aggravated battery causing great bodily harm; (2) his trial counsel provided ineffective assistance; (3) his nine-year sentence constituted an abuse of discretion; and (4) his MSR term should be reduced to one year. We affirm defendant's conviction and nine-year sentence and reduce his MSR term.

¶ 3    At trial, Delisa Cousins testified that on March 14, 2017, she and the victim, Ammar Mohsen, were working in a convenience store connected to a gas station at 300 West Garfield Boulevard. At about 6 a.m., defendant walked in and "stole" some candy from the front of the counter. The victim "said a few words" to defendant, who then left. Defendant returned at about 7:30 a.m. The victim came around from behind the counter and told defendant to leave because he had stolen the candy. They began arguing and then defendant struck the victim and pushed him out the door and they started wrestling and "tussling." Cousins stood at the door, told the victim to let defendant go, and then returned inside. As Cousins went toward the counter, another customer inside the store exclaimed that defendant had just stabbed the victim. Cousins called 911 and went to the door, where she saw that the victim had been stabbed on the left side of his neck. Defendant left.

¶ 4    The victim walked inside the store. He was "upset," and he tried cleaning the wound. Cousins saw some blood, although she agreed on cross-examination that "it wasn't dripping all over the place." Cousins told him he needed a paramedic after seeing the wound and she made another 911 call. The paramedics arrived and the victim left with them to go to the hospital. On March 20, 2017, detectives showed Cousins a photo array and she identified defendant.

¶ 5    The State showed Cousins People's Exhibit No. 2, which she identified as a photograph of the victim with the injury to his neck that resulted from the stabbing. People's Exhibit No. 2 is contained in the record on appeal and it shows a laceration or tear in the skin about two inches in length. There was no medical testimony at trial describing the depth of the wound. From People's Exhibit No. 2, though, one can see that the wound extends below the skin. The middle of the wound is bloody and red; the edges of the wound show dried blood.

¶ 6    Detective Schmitt testified that he arrived at the gas station following the stabbing and recovered video footage that recorded the incident. He captured a screen shot of defendant's face and ultimately compiled a photo line-up which included a photograph of defendant. The photo line-ups were shown to Cousins and to the victim, after which Detective Schmitt submitted an investigative alert to have defendant arrested.

¶ 7    Defendant was arrested on March 30, 2017 and brought to the police station. Detective Schmitt and his partner spoke with defendant at about 5 p.m. After being given his *Miranda* warnings, defendant initially stated that he had gotten into a fight with the victim at the gas station and struck and bit him, but he denied using a weapon against the victim. Officer Schmitt then showed defendant the photograph of the victim's injured neck, and defendant responded that "he had a house key that must have caused the cut on the neck." Detective Schmitt showed defendant a screen shot from one of the video clips showing him "holding an object in his hand that was considerably larger than a key or set of keys."[1] Defendant subsequently admitted to stabbing the

---

[1] People's Exhibit No. 8, the screen shot that Detective Schmitt showed defendant, was admitted into evidence and is contained in the record on appeal. People's Exhibit No. 8 shows a dark, side-view of defendant holding an object of some sort outside the convenience store, but it is difficult to determine from the screen shot the actual size or the identity of the object.

victim with a small pocketknife approximately three inches in length. Defendant no longer had the pocketknife because it was stolen from his house.

¶ 8    Detective Schmitt also met with the victim at the police station a "couple days" after the stabbing. The victim removed a bandage from his neck and showed him the stab wound. The victim also showed the detective a bite mark on his chest which he sustained in his fight with defendant. Detective Schmitt took a photograph of the bite mark. The State showed Detective Schmitt People's Exhibit Nos. 6 and 7, which he identified as photographs of the bruise caused by defendant's bite and are contained in the record on appeal. It is difficult to make out any bruising in People's Exhibit No. 6. People's Exhibit No. 7 more clearly shows a purple bruise below the victim's right nipple.

¶ 9    The State showed Detective Schmitt People's Exhibit No. 2, the photograph of the injury to the victim's neck. The photograph of the injury was "a little more fresh than at the point [he] saw it," but it accurately depicted the injury.

¶ 10    The parties stipulated that if called to testify, Marisoll Sindellar would state that she works for the Chicago Fire Department and that she arrived at the gas station at 300 West Garfield Boulevard at approximately 8:10 a.m., saw the victim at 8:11, departed the scene with the victim at 8:15 and arrived at the hospital at 8:20. Sindellar would testify that the victim had been stabbed on the left side of his throat, that he had "approximately a two-inch laceration and he was treated by the ambulance." There was no stipulation or other evidence as to the type of treatment provided.

¶ 11    The court viewed video clips of the confrontation between defendant and the victim after admitting them into evidence. The video clips are contained in the record on appeal. One of the clips shows defendant and the victim arguing inside the gas station. Other customers are inside. Defendant grabs the victim by the neck and pushes him. They continue to argue, and then

defendant pushes the victim outside the front door and wrestles him forcefully to the ground. They get back to their feet and wrestle with each other. Cousins comes to the door, opens it, and says something to them. Then she closes the door and moves back toward the counter. Defendant lunges toward the victim, who suddenly grabs his throat and runs from defendant. Defendant follows the victim but then walks away. As defendant's back is to the camera during much of the fight, the video does not clearly show the pocketknife in his hand at the time he injured the victim's throat.

¶ 12    Other clips show the victim inside the store after the fight, continually holding a covering (a towel or cloth) at his neck and speaking with members of the Chicago Fire Department, who subsequently give him a different, smaller covering to place on his neck. The injury to the neck cannot be clearly seen on the video. The victim also speaks with a police officer, walks around the store, and looks at his cell phone.

¶ 13    The video clips were admitted without any commentary or explanation of the depicted events by any witness.

¶ 14    The victim did not testify at trial.

¶ 15    The court convicted defendant of aggravated battery causing great bodily harm, aggravated battery using a deadly weapon, and aggravated battery causing permanent disfigurement. The court sentenced defendant to nine years' imprisonment and two years of MSR for the conviction of aggravated battery causing great bodily harm and merged the remaining two aggravated battery convictions without imposing a sentence thereon. Defendant appeals.

¶ 16    Defendant contends that the State failed to prove him guilty of aggravated battery causing great bodily harm. When considering a challenge to a criminal conviction based on the sufficiency of the evidence, our inquiry is limited to whether, after viewing all the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the

offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). It is the function of the trier of fact to assess witness credibility, weigh and resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Jamison*, 2018 IL App (1st) 160409, ¶ 31. We will not overturn a conviction based on insufficient evidence unless the proof is so improbable or unsatisfactory that a reasonable doubt exists as to defendant's guilt. *People v. Williams*, 193 Ill. 2d 306, 338 (2000).

¶ 17    In rendering its verdict here, the court considered witness testimony as well as video clips of the altercation and its aftermath and photographs of the injury admitted as substantive evidence. Defendant does not argue that the video clips and photographic evidence were inadmissible to depict the altercation and the victim's resulting injury or that the court could not draw all reasonable inferences from such evidence. See *People v. Smith*, 152 Ill. 2d 229 (1992) (discussing the admissibility of photographic evidence); *People v. Taylor*, 2011 IL 110067 (discussing the admissibility of surveillance video). Defendant's argument, rather, is that the properly admitted evidence, testimonial as well as photographic and video, was insufficient to convict him of aggravated battery causing great bodily harm. When considering a verdict premised on testimonial, as well as on photographic and video evidence, our standard of review remains the traditional one employed in *Jackson*; we view the video clips and photographs admitted as substantive evidence, examine all the testimony, and then consider all the testimonial, photographic, and video evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of aggravated battery causing great bodily harm beyond a reasonable doubt. *People v. Span*, 2011 IL App (1st) 083037, ¶¶ 26-28.

¶ 18    A person commits battery if he knowingly without legal justification by any means causes bodily harm to an individual. 720 ILCS 5/12-3(a) (West 2016). A person commits aggravated

battery when, in committing a battery, he knowingly causes great bodily harm or permanent disability or disfigurement or uses a deadly weapon. 720 ILCS 5/12-3.05(a)(1), (f)(1) (West 2016). Defendant argues that we should vacate his conviction for aggravated battery causing great bodily harm, and reduce the conviction to simple battery, because the State only proved that he inflicted bodily harm on the victim, not *great* bodily harm.

¶ 19    In addressing defendant's argument, we must determine the meaning of "bodily harm" as required to sustain a simple battery conviction, and "great bodily harm" as required to sustain an aggravated battery conviction. Several cases are informative.

¶ 20    In *People v. Mays*, 91 Ill. 2d 251 (1982), our supreme court was considering defendant's rape conviction. The issue on appeal was whether the trial court erred by refusing to give an instruction for battery as a lesser included offense of rape. *Id.* at 254-55. The supreme court noted that there were two types of battery, battery causing bodily harm and battery by insulting or provoking conduct. *Id.* at 256. In differentiating the two types of batteries, the supreme court stated:

> "Although it may be difficult to pinpoint exactly what constitutes bodily harm for the purposes of the statute, some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent, is required. Otherwise there would be no need for the other type of battery, contact of an insulting or provoking nature."

¶ 21    In *People v. Figures*, 216 Ill. App. 3d 398 (1991), defendant was convicted of armed violence predicated on aggravated battery causing great bodily harm. *Id.* at 399. The evidence established that the victim was shot at by defendant. The shot pierced his shoe but did not penetrate his skin. *Id.* at 402. A witness saw the victim limping after the shot, but no one saw any blood on

his shoe. *Id.* Although the victim was treated at a hospital, his injury only required "very little attention":

"[t]hey put a little iodine on my foot. At first they cut the little blood clot open, and then they put iodine on there and patched it up." *Id.*

¶ 22    We held that the injury clearly rose to the level of bodily harm as defined in *Mays* for purposes of a simple battery, but that it did not rise to the level of great bodily harm for purposes of aggravated battery. *Id.* We noted:

"Because great bodily harm requires an injury of a graver and more serious character than an ordinary battery, simple logic dictates that the injury must be more severe than that set out in the *Mays* definition. The word 'great' must be given effect in construing the aggravated battery statute; statutes should be interpreted so that no word or phrase is rendered superfluous or meaningless." *Id.* at 401.

¶ 23    We vacated defendant's armed violence conviction because the State had failed to prove the predicate felony of aggravated battery. *Id.* at 402.

¶ 24    In *In re J.A.*, 336 Ill. App. 3d 814 (2003), defendant was adjudicated delinquent of aggravated battery causing great bodily harm. *Id.* at 815. The evidence at trial showed that defendant stabbed the victim with an unidentified sharp object four to five inches in length in the back left shoulder, which the victim described as feeling like a pinch. *Id.* at 815, 817-18. He was advised to get stitches, but there was no evidence as to the number of stitches recommended or the nature and extent or size or depth of the wound and the trier of fact was not given the opportunity to view the wound photographically or in open court. *Id.* at 818. On appeal, defendant contended that the State failed to prove the element of great bodily harm beyond a reasonable doubt. *Id.* at 815. In analyzing defendant's argument, we cited *Figures* and held that " 'great bodily harm' is

more serious or grave than lacerations, bruises, or abrasions that characterize 'bodily harm.' " I*d.* at 817. We noted that in determining whether the State proved great bodily harm beyond a reasonable doubt, consideration must be given to the "evidence of what injury the victim actually received, the evidence of the nature and extent of the victim's injury, and evidence of the treatment required." *Id.* at 818. Reviewing all the evidence in the light most favorable to the prosecution, we concluded there was insufficient evidence that the victim suffered great bodily harm as required by the aggravated battery statute given the lack of any testimony or photographs or in-court demonstration of the size, depth, length, or extent of the injury. *Id.* We held that the State was required to show more than evidence of a single stab wound of indeterminate size, which felt like a pinch and for which an indeterminate number of stitches were advised by someone unnamed. *Id.* at 818-19. We modified the adjudication of delinquency from aggravated battery to battery. *Id.* at 819.

¶ 25    In a concurring opinion, Justice Gallagher stated that the injury did not rise to great bodily harm because "[b]efore one can truly call bodily harm 'great,' it should be more severe than what one might do to a finger with a kitchen knife while cutting vegetables." *Id.* at 820 (Gallagher, J., concurring).[2]

¶ 26    In *People v. Cisneros*, 2013 IL App (3d) 110851, the evidence at trial showed that defendant stabbed the victim with a knife, causing lacerations to his hand, neck, shoulder, back, and forearm. Photographs revealed "a deep gash to his hand, a long laceration to his shoulder, a neck wound with a portion of the flesh loose from the underlying tissue, and a shallow laceration

---

[2] Justice O'Brien issued a dissenting opinion in *J.A.*, stating that a stab wound requiring stitches and inflicted by a sharp weapon is great bodily harm and that she would affirm defendant's conviction for aggravated battery. *Id.* (O'Brien, J., dissenting).

to his forearm." *Id.* ¶ 13. The victim received medical treatment, including stitches to some of the wounds. *Id.* The jury viewed the victim's scars from each of the five lacerations. *Id.*

¶ 27    On appeal from his conviction of aggravated battery causing great bodily harm, defendant argued that the victim's injuries did not qualify as great bodily harm because they were nothing more than "superficial" lacerations. *Id.* ¶ 14. Defendant cited *Figures* and *J.A.*, which held that great bodily harm sufficient for aggravated battery must be something more than the injuries defined as mere bodily harm by our supreme court in *Mays* for purposes of simple battery, *i.e.*, they must be more than "lacerations, bruises or abrasions, whether temporary or permanent." *Id.*

¶ 28    The *Cisneros* court found that *Figures*'s and *J.A.*'s analysis of *Mays* was faulty, stating:

> "We reject the notion that the supreme court's discussion in *Mays* is somehow useful in distinguishing battery from aggravated battery. Clearly, the supreme court was differentiating battery by bodily harm from battery by insulting or provoking contact. Additionally, can any reasonable person accept the notion that the supreme court meant to say that a victim left with 'permanent' 'physical pain or damage to the body' has not suffered great bodily harm, but only bodily harm? Because if, as *Figures* posits, the *Mays* court was defining simple battery, then that is what we are left with. To the contrary, the court's language makes it clear that it was describing all varieties of bodily harm: minor, great and in-between. However, it did so in the context in which it found itself: discussing whether battery is a lesser-included offense of rape. The *Mays* court had no reason to discuss aggravated battery." *Id.* ¶ 18.

¶ 29    *Cisneros* held that in the case before it, the extensive evidence of the seriousness of the victim's lacerations, including photographic evidence and a visual display of his numerous scars, was sufficient to establish the great bodily harm necessary to sustain the aggravated battery

conviction even in the absence of medical testimony regarding the severity and permanency of the lacerations. *Id.* ¶¶ 20-21.

¶ 30    We agree with *Cisneros* (and with Justice Gallagher's concurring opinion in *J.A.*) that while minor lacerations such as a small cut to a finger caused by a kitchen knife do not rise to the level of great bodily harm, other lacerations may rise to such a level if sufficient evidence is presented as to their severity. The present case is more similar to *Cisneros* than to *J.A.*, as there was ample evidence presented to the trier of fact regarding the size, depth, length, and extent of the victim's laceration showing its severity. Cousins testified that after the victim returned to the store following the altercation with defendant, he had a "gash" on the left side of his neck "near his veins" which was bleeding. The victim was "upset" and attempted to clean the wound himself. After viewing the wound, Cousins determined that he needed a paramedic, so she called 911. The parties stipulated to Sindellar's testimony that the victim had a two-inch laceration on his neck and was "treated by the ambulance" and taken to the hospital. The court was presented with People's Exhibit No. 2, a photograph of the victim's injury, which corroborates Sindellar's stipulated testimony that the laceration to the victim's neck was two inches in length, and also shows that the wound ran below the skin and was red and bloody in the middle. Detective Schmitt testified that a couple of days after the incident, the victim was still wearing a bandage on his neck. When the victim took the bandage off, the stab wound was still visible.

¶ 31    The court was also presented with video of the incident, which showed that defendant grabbed the victim's neck while inside the store and pushed him, then shoved the victim out the door and violently wrestled him to the ground, before lunging at his neck. Defendant admitted to Detective Schmitt that he bit the victim and People's Exhibit No. 7 depicts the resulting bruise on the victim's chest resulting from the bite. Defendant also admitted to using a three-inch

pocketknife to stab the victim in the neck. The violent nature of the action taken by defendant against the victim is a relevant consideration when determining whether great bodily harm has been proved. See *People v. Matthews*, 126 Ill. App. 3d 710 (1984) (victim suffered great bodily harm when she was hit on the head and arms with three "full force blows" from a baseball bat); *People v. Lopez-Bonilla*, 2011 IL App (2d) 100688 (victim suffered great bodily harm when he was hit in the head with a gun and his head was repeatedly slammed into a desk drawer). In addition to showing how defendant violently attacked the victim, the video clips also show the victim in the store after the attack, continually holding a covering to his neck, and later being given a different covering by emergency personnel.

¶ 32    Viewing all the testimony, photographs, and video clips in the light most favorable to the prosecution, any rational trier of fact could have found that defendant committed a forceful and violent attack against the victim in which he pushed, wrestled, and bit the victim in the chest and then stabbed him in the neck with a three-inch pocketknife. The stab wound just missed the victim's veins but left a two-inch long, bloody "gash," or laceration, extending below the skin, which required treatment from paramedics and a trip to the hospital and was still evident days later. Any rational trier of fact could have found from all this evidence that the forceful attack, culminating in the stab wound to the neck[3], caused great bodily harm sufficient to sustain defendant's conviction of aggravated battery.

---

[3] The State also argues on appeal that the bruise to the chest from the bite is evidence of great bodily harm, but we note that in the charging document, the only evidence of great bodily harm described therein was the stab to the neck; defendant was not charged with aggravated battery based on the bruise. Thus, while the bite and resulting bruise is relevant to the general forcefulness of the attack, we focus on the stab wound to the neck in determining whether the victim suffered great bodily harm.

¶ 33    Next, defendant argues that his trial counsel committed ineffective assistance by failing to move to suppress his statements because he was arrested based only on an investigative alert. A criminal defendant has the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant claiming ineffective assistance must show that counsel's conduct "fell below an objective standard of reasonableness," and the conduct prejudiced defendant. *Strickland*, 466 U.S. at 687-88, 692. To establish the prejudice prong, defendant must show that there is a reasonable probability that the motion to suppress would have been granted and that the outcome of the trial would have been different had the evidence been suppressed. *People v. Bew*, 228 Ill. 2d 122, 128-29 (2008). We review ineffective assistance of counsel claims *de novo*. *People v. Ross*, 2019 IL App (1st) 162341, ¶ 26.

¶ 34    Defendant's ineffective assistance claim raises the question whether an investigative alert that is supported by probable cause may serve as the basis of an arrest, if the police do not obtain a warrant issued pursuant to an affidavit. Defendant does not argue that the officers lacked probable cause to arrest him. Defendant argues that the officers' authority to arrest him derived entirely from the investigative alert, that the alert was insufficient under Article I, section 6 of the Illinois Constitution, and therefore that his counsel was ineffective for failing to file a motion to suppress. Article I, section 6 provides:

"The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches [and] seizures ***. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, § 6.

¶ 35    Defendant cites in support *People v. Bass*, 2019 IL App (1st) 160640, in which a divided panel of this court ruled that the defendant's warrantless arrest, premised on probable cause, did

not violate the fourth amendment but did violate the Illinois Constitution. Finding that the Illinois Constitution's search and seizure protections were not in strict lockstep with the fourth amendment of the United States Constitution, the *Bass* court ruled:

> "we find, with regard to the necessity of a warrant issued by a neutral magistrate, historical precedent concludes that article I, section 6, provides greater protections than the fourth amendment. Indeed, arrests based solely on investigative alerts, even those supported by probable cause, are unconstitutional under the Illinois Constitution." *Id.* ¶ 43.

¶ 36    *Bass* was decided after defendant's trial, and therefore his counsel was not ineffective for failing to file a motion to suppress based on a decision that had not yet been published. Even if *Bass* had been published prior to defendant's trial and counsel had filed a motion to suppress pursuant thereto, no reasonable probability exists that the motion would have been granted, as *Bass* has been explicitly rejected by a number of decisions. For example, in *People v. Braswell*, 2019 IL App (1st) 172810, we noted that the flaw in *Bass*'s reasoning is that arrests must be based on probable cause, not warrants as the majority in *Bass* suggests. *Id.* ¶ 39. *Bass*'s flawed reasoning "creates the somewhat paradoxical situation where police may arrest an individual without a warrant and without an investigative alert if they have probable cause to do so, but that same arrest becomes unconstitutional if police issue an investigative alert based on the same facts that gave rise to the probable cause." *Id.* This inconsistency was identified by Justice Mason in her dissent in *Bass*, 2019 IL App (1st) ¶ 120 (Mason, J., concurring in part and dissenting in part) ("And I can conceive no principled basis on which to hold that the police may arrest an individual without a warrant and without an investigative alert as long as they have probable cause, but if they issue an investigative alert based on the same facts giving rise to probable cause, they have run afoul of the Illinois Constitution."). The *Braswell* court adopted the view outlined by Justice Mason in her

-14-

dissent in *Bass* and held that where an investigative alert has a proper basis to show probable cause, an arrest pursuant thereto does not run afoul of the Illinois Constitution. *Braswell*, 2019 IL App (1st) 172810, ¶ 39. See also *People v. Thornton*, 2020 IL App (1st) 170753, *People v. Bahena*, 2020 IL App (1st) 180197 and *People v. Simmons*, 2020 IL App (1st) 170650 agreeing with *Braswell* (and with Justice Mason's dissent in *Bass*) and rejecting the majority opinion in *Bass*. Given *Braswell*'s, *Thornton's*, *Bahena's*, and *Simmons's* rejection of *Bass*, there is no reasonable probability that a suppression motion premised on *Bass* would have been successful. Accordingly, defendant's claim of ineffective assistance fails.

¶ 37    Next, defendant contends that his sentence of nine years' imprisonment constituted an abuse of discretion. Under the Illinois Constitution, the trial court must impose a sentence balancing the seriousness of the offense and defendant's rehabilitative potential. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. In doing so, the court must consider aggravating and mitigating factors including " 'the nature and circumstances of the crime, the defendant's conduct in the commission of the crime, and the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education .' " *Id.* (quoting *People v. Maldonado*, 240 Ill. App. 3d 470, 485-86 (1992)). Because the trial court is in the best position to weigh those factors, the sentence imposed will not be reversed absent an abuse of discretion. *Knox*, 2014 IL App (1st) 120349, ¶ 46. The reviewing court "must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and the purpose of the law or manifestly disproportionate to the nature of the offense. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20.

¶ 38    Defendant here was convicted of aggravated battery, a Class 3 felony for which the normal sentencing range is 2 to 5 years. 720 ILCS 5/12-3.05(h) (West 2016); 730 ILCS 5/5-4.5-40 (West 2016). However, due to defendant's previous conviction in the last 10 years for an offense of the same class or greater (a Class 2 conviction for possession of a stolen motor vehicle in 2009), he faced an extended sentencing range of 5 to 10 years. 730 ILCS 5/5-5-3.2(b)(1) (West 2016); 730 ILCS 5/5-4.5-40(a) (West 2016).

¶ 39    At the sentencing hearing, the court read the presentencing investigative report and heard the evidence in aggravation and mitigation. In aggravation, the State argued that defendant has an extensive criminal background including convictions for aggravated criminal sexual assault, home invasion, armed robbery, robbery, and possession of a stolen motor vehicle. The State also noted the violent nature of the knife attack against the victim here.

¶ 40    In mitigation, defendant argued that he has a history of depression and substance abuse, served in the United States armed forces, volunteers at his church's food bank, and is a caretaker for his mother, who has cancer. In allocution, defendant apologized for his "actions" and reiterated that his mother has cancer and that he is her only caretaker.

¶ 41    The court noted that defendant had spent "the better half" of the last 30 years in prison, so for him to be his mother's primary caretaker "seems a little bit impossible." The court stated that it had viewed the video clips of the incident and saw the "violent nature" in which defendant had attacked the victim. The court noted defendant's long criminal history and then stated:

> "I don't see any learning pattern here, Mr. Thompson. And what concerns me greatly is the violent nature in which you attacked [the victim] and I do not think that five or six is warranted. I do not think that 10 is warranted, State, as you're asking for the maximum. I

will sentence him to nine years Illinois Department of Corrections followed by two years mandatory supervised release."

¶ 42    Defendant's nine-year sentence was within the applicable sentencing range and did not constitute an abuse of discretion.

¶ 43    Next, defendant contends that his two-year MSR term was not authorized by statute, and that the correct term was one year. See 730 ILCS 5/5-4.5-40(l) (West 2016) (providing for a one-year MSR term for Class 3 felonies). The State agrees. Accordingly, pursuant to our authority under Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967), we reduce defendant's MSR term to one year.

¶ 44    For all the foregoing reasons, we affirm defendant's conviction and nine-year sentence and reduce his MSR term to one year.

¶ 45    Affirmed as modified.