2024 IL App (1st) 230262-U

No. 1-23-0262

Order filed August 5, 2024

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 23582 |
| | ) | |
| THOMAS CARREL, | ) | Honorable |
| | ) | Michele M. Pitman, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in denying defendant's motion for a new trial alleging ineffective assistance of counsel for failing to impeach the victim with prior inconsistent statements and omissions. And the evidence sufficiently established that defendant inflicted great bodily harm on the victim.

¶ 2    Following a bench trial, defendant Thomas Carrel was found guilty of criminal sexual

assault (720 ILCS 5/11-1.20(a)(1) (West 2012)) and aggravated battery (720 ILCS 5/12-3.05(a)(1)

(West 2012)) and sentenced to concurrent prison terms of 12 and 5 years. On appeal, defendant

argues (1) the trial court erred in denying his motion for a new trial alleging ineffective assistance of counsel based on counsel's failure to impeach the victim with prior inconsistent statements and omissions, and (2) the State failed to prove defendant guilty of aggravated battery. We affirm.

¶ 3    Defendant was charged with criminal sexual assault and aggravated battery causing great bodily harm. At trial, T.J. testified that in 2013 she lived in Robbins, Illinois, and knew defendant because he had tattooed her. Although they were friends, they did not have a sexual relationship. On March 4, 2013, T.J. had plans to go out with defendant and April Hampton. Defendant picked up T.J. from her home. He initially refused to pick up Hampton, but eventually agreed. They purchased tequila at a liquor store, which they drank in the parking lot of a Markham club before entering. Inside, defendant purchased drinks for both women. After consuming some of her own drink, Hampton grabbed T.J.'s drink from her and poured it out. Defendant bought T.J. another drink and she accompanied him to the bar. T.J. later got sick, vomited, and was asked to leave the club. Defendant and Hampton assisted T.J. to defendant's vehicle. Defendant placed T.J. in the front passenger seat and drove away without Hampton.

¶ 4    The next thing T.J. remembered was waking up while defendant was having sex on top of her. She did not know where she was because it was dark. T.J. told defendant to "get off" and attempted to push him off. Defendant hit her on the left side of her face, and she lost consciousness.

¶ 5    When T.J. woke up the next morning, she was on defendant's living room couch, naked from the waist down. She went to the bathroom and looked at her face, which did not feel "right," and saw dried blood "everywhere." Defendant, who was sleeping in his bedroom, woke up when T.J. entered the room. T.J. asked defendant for her phone and clothes and got dressed. After calling her mother, she called the police. When the police arrived, T.J. told them what happened, requested

medical treatment, and was eventually treated by paramedics. At the hospital, T.J. received a sexual assault kit and talked to a nurse about what she recalled. The entire left side of T.J.'s face was bruised and the inside of her mouth was "split." T.J.'s lip was also bruised.

¶ 6    At trial, T.J. identified photographs of her injuries taken at the hospital. She also identified photographs of, *inter alia*, the coat she was wearing on March 4, 2013, showing a "red substance" which was not there before the incident, and defendant's bed, showing a "reddish-brown substance" on the sheet.

¶ 7    On cross-examination, T.J. stated that defendant picked her up at her house between 9 and 10 p.m. She did not recall arriving at defendant's house, or know where she was when she woke up and realized defendant was having sex with her. T.J. spoke with a police officer on March 5, 2013, but did not recall telling the officer that defendant tried to "get up all on me" in his bedroom. She recalled saying that she told defendant "if [her] sister and father were there, [defendant] wouldn't be hitting [her]," but did not recall saying that she woke defendant up. T.J. denied engaging in sexual acts with defendant in exchange for tattoos.

¶ 8    Hampton testified that she went to a club with T.J. and defendant on March 4, 2013. She did not know defendant well. They drank tequila in the club parking lot before entering the club. Inside, defendant bought Hampton and T.J. drinks, which she poured out because they "tasted funny." They stayed in the club until T.J. became "dizzy" and "woozy," and began vomiting. Hampton helped T.J. walk to defendant's vehicle, but defendant drove away before Hampton could get in the car. When Hampton saw T.J. the next day, her face was injured.

¶ 9    On March 5, 2013 at approximately 8:26 a.m., Blue Island firefighter and emergency medical technician (EMT) John Duffy was dispatched to the location of "a person with a swollen

jaw." Upon arrival, he encountered T.J., who "had massive swelling on the left side of her face, scratches on [her] right shoulder, and *** seemed disheveled."

¶ 10    Chicago Heights police detective Timothy Hannagan assisted paramedics with T.J., who was outside defendant's residence when he arrived.[1] T.J.'s face was swollen and she had blood around her mouth. After Hannagan spoke with T.J., she was transported to the hospital. When Hannagan spoke with defendant, he observed a scratch on his left cheek and a lump on his forehead.

¶ 11    Blue Island police sergeant David Nedved interviewed T.J. at the hospital on March 5. He observed "redness, swelling, [and] bleeding" on her face, which he photographed. Nedved also talked to defendant at the police station, and observed a couple of scratches on his face. Defendant stated that he had scratched himself and consented to an oral swab. Nedved photographed the scene at defendant's house and collected defendant's bedsheet, which had "a significant amount of red blood-like substance." Nedved also saw red, "blood-like," dots on the wall and ceiling, which he photographed and swabbed, and collected clothing and tissues with the same "blood-like" substance. Later that day, Nedved returned to the hospital to collect the sexual assault kit.

¶ 12    On cross-examination, Nedved confirmed that he summarized his conversations with T.J. at the hospital in his reports. One of defendant's attorneys asked Nedved whether T.J. told him that she did not know how she got into defendant's house. The court sustained the State's objection that "[t]his has to be very narrowly tailored to what she was confronted about." The attorney also asked Nedved whether T.J. told him that defendant attempted to "get all up on [her]," arguing that

_____

[1] Hannagan testified that he worked for the City of Blue Island as a police officer on March 5, 2013.

it was impeachment by omission if she failed to do so. The court also sustained the State's objection to that question.

¶ 13    Registered nurse Laura Maida treated T.J. at the hospital. T.J. told Maida that she had gone out with friends and "the assailant," who "wanted to be sexual with her," but she was not interested. T.J. said that the "last thing she remembered was being punched in the face" and that she went to the hospital "for a possible sexual assault" after she woke up without pants or underwear. Maida observed bruising and swelling on T.J.'s face, and a laceration on her lip. She administered a sexual assault kit and collected a blood standard.

¶ 14    Forensic scientist Christopher Webb conducted a forensic analysis for deoxyribonucleic acid (DNA) using defendant's buccal standard and the sexual assault kit collected from T.J. Webb identified a male DNA profile matching defendant from the sexual assault kit. Webb also tested swabs from the bedsheet, tissue, and bedroom "wall," and identified T.J.'s DNA profile.

¶ 15    In closing, defense counsel argued, *inter alia*, that the evidence did not establish that T.J. was intoxicated, and that she lied when she said that she did not remember the incident. Counsel also argued that the State fell "short" of proving great bodily harm.

¶ 16    In finding defendant guilty of criminal sexual assault and aggravated battery, the court found that the evidence, including the photographs of T.J.'s injuries, the "blood-like stains" at defendant's residence, and T.J.'s testimony established that force was used and sexual penetration occurred. The court also found that defendant caused great bodily harm to T.J.

¶ 17    Defendant's attorneys filed a motion for a new trial, arguing, in relevant part, that the State failed to prove defendant guilty beyond a reasonable doubt.

¶ 18    Defendant subsequently hired a new attorney, who filed an amended motion for a new trial, arguing, *inter alia*, that the State failed to prove defendant guilty of aggravated battery because the evidence only established minor injuries "such as bruising or lacerations." Counsel also argued that defendant's trial attorney was ineffective because she failed to impeach T.J. with prior inconsistent statements, including impeachment by omission (*i.e.*, T.J.'s failure to tell Hannagan and her mother about the sexual assault, and the discrepancies between her trial testimony and her statements to Nedved).

¶ 19    The court denied the motion, finding that the State presented "ample evidence" that defendant caused great bodily harm to T.J., including the photographs of T.J.'s injuries, T.J.'s testimony, and the blood-like stains with T.J.'s DNA recovered from the walls and ceiling of defendant's home. The court also noted that the performance of defendant's trial attorneys did not fall below an objective standard of reasonableness and that defendant was unable to show that the outcome at trial would have been different but for counsel's purported errors.

¶ 20    After the sentencing hearing, defendant was sentenced to concurrent terms of 12 years' imprisonment for criminal sexual assault and 5 years' imprisonment for aggravated battery.

¶ 21    On appeal, defendant argues that his trial attorneys were ineffective because they failed to impeach T.J. with her inconsistent statements to Nedved that she recalled arriving at defendant's house, that defendant tried to "get all up on [her]," and that she was conscious and clothed when defendant punched her in his bedroom. Defendant contends these statements contradict T.J.'s trial testimony.

¶ 22    We review claims of ineffective assistance of counsel using the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Manning*, 241 Ill. 2d 319, 326 (2011).

To establish a claim of ineffective assistance, a defendant must demonstrate that (1) counsel's performance was objectively unreasonable under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. *People v. Veach*, 2017 IL 120649, ¶ 30. In order to establish prejudice, the defendant must show a reasonable probability that, but for the errors, the result of the proceeding would have been different; namely, a "probability sufficient to undermine confidence in the outcome." *Id.* A defendant must satisfy both prongs to raise a successful claim. *Id.* Our review is *de novo*. *People v. Demus*, 2016 IL App (1st) 140420, ¶ 21.

¶ 23    "Generally, the decision of whether or not to cross-examine or impeach a witness is a matter of trial strategy, which cannot support a claim of ineffective assistance of counsel." *People v. Bell*, 2021 IL App (1st) 190366, ¶ 79. Deciding how to cross-examine a witness involves "the exercise of professional judgment which is entitled to substantial deference from a reviewing court." (Internal quotation marks omitted.) *Id.* Thus, a defendant can only prevail on an ineffectiveness claim by showing that his counsel's approach was objectively unreasonable. *Id.*

¶ 24    A defendant is entitled to competent rather than perfect representation, and mistakes in strategy or tactics do not, alone, render counsel's representation incompetent. *People v. Johnson*, 372 Ill. App. 3d 772, 777-78 (2007). Due to the "variety of factors" affecting trial strategy, "claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002).

¶ 25    Under impeachment by omission, "it is permissible to use prior silence to discredit a witness' testimony if: (1) it is shown that the witness had an opportunity to make a statement, and

(2) under the circumstances, a person normally would have made the statement." *People v. Williams*, 329 Ill. App. 3d 846, 854 (2002).

¶ 26    Defendant cannot establish that counsel's alleged failure to impeach T.J. with prior inconsistent statements and omissions prejudiced him. The evidence established that defendant engaged in sexual activity with T.J. while she was passed out, without her consent. The evidence further showed that when T.J. woke up and tried to resist, defendant hit her in the face with so much force that she passed out again. When she woke up the next morning, her face was swollen and bruised, and she was not wearing pants or underwear. Responding EMT Duffy described "massive swelling on the left side of her face." In addition, the testing of the sexual assault kit revealed defendant's DNA on the swabs taken from T.J. and T.J.'s DNA was recovered from "blood-like" stains on defendant's wall and bedsheet. The evidence overwhelmingly established that defendant sexually assaulted T.J. and committed an aggravated battery against her.

¶ 27    Even assuming *arguendo* that T.J.'s statements to Nedved conflicted with her trial testimony, inconsistencies regarding whether she was conscious or unconscious when she arrived at defendant's home, when or where defendant initiated the unwanted sexual acts or punched her in the face, or whether she was fully clothed when defendant attacked her are not material. T.J.'s testimony established that defendant hit her in the face during unwanted sexual activity. Since T.J. told both Hannagan and her mother that she woke up in defendant's house without pants and underwear, defendant's argument that T.J. failed to specifically inform them that she had been sexually assaulted is without merit. It follows that defendant is unable to show that, but for counsel's failure to impeach T.J. with prior inconsistent statements or omissions, "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different.' " See *Veach*, 2017 IL 120649, ¶ 30 (quoting *People v. Domagala*, 2013 IL 113688, ¶ 36). Because defendant cannot establish prejudice, his ineffectiveness claim fails. See *id.*

¶ 28    Defendant next contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt of aggravated battery because T.J.'s "lacerations, bruises, or abrasions" were not severe enough to constitute great bodily harm.

¶ 29    The standard of review for a challenge to the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Belknap*, 2014 IL 117094, ¶ 67. The trier of fact resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from basic facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. This court will not retry the defendant or substitute its judgment for that of the trier of fact on the weight of the evidence or credibility of witnesses. *Id*. A reviewing court must allow all reasonable inferences from the record in favor of the prosecution (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)) and will not reverse a conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt" (*People v. Jackson*, 232 Ill. 2d 246, 281 (2009) (internal quotation marks omitted)).

¶ 30    To prove aggravated battery as charged, the State had to prove beyond a reasonable doubt that defendant, during the commission of a battery on T.J., knowingly caused her great bodily harm. 720 ILCS 5/12-3.05(a)(1) (West 2012). To prove the battery, the State had to prove

defendant knowingly and without legal justification caused bodily harm to T.J. or made physical contact of an insulting and provoking nature with her. 720 ILCS 5/12-3(a) (West 2012).

¶ 31    Defendant does not dispute that he committed a battery against T.J. He only challenges the sufficiency of the evidence establishing the aggravating factor (*i.e.*, that he caused T.J. great bodily harm). "[W]hat constitutes 'great bodily harm' to support a charge of aggravated battery is a question of fact to be determined by the finder of fact." *People v. Crespo*, 203 Ill. 2d 335, 344 (2001). The question is not what treatment the victim underwent, but what injuries he or she received. *People v. Thigpen*, 2017 IL App (1st) 153151, ¶ 29.

¶ 32    As an initial matter, we note that numerous photographs showing T.J.'s injuries were admitted into evidence at trial but are not included in the record on appeal. Defendant, as the appellant, has the burden of presenting a record sufficient to support his claims of error, and any doubts or deficiencies arising from an incomplete record will be resolved against him. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 33    Even without the photographs of T.J.'s injuries, the evidence overwhelmingly shows that defendant inflicted injuries that caused her great bodily harm. T.J. testified that defendant hit her face so hard that she passed out. When she regained consciousness, her face was swollen, bruised, and bloody. At the scene, EMT Duffy observed "massive swelling on the left side of [T.J.'s] face." In addition, T.J.'s DNA was recovered from red "blood-like" stains on defendant's bedsheets and walls, with similar red stains observed on defendant's ceiling and on T.J.'s clothing. It is reasonable to infer that defendant struck T.J.'s face so severely that she bled profusely onto the surfaces around her, with "blood-like" spray splattering the walls and the ceiling.

¶ 34    Defendant nevertheless argues that the State only proved misdemeanor battery, because the injuries were "nothing more" than lacerations, bruises, or abrasions, citing *People v. Mays*, 91 Ill. 2d 251, 256 (1982) (describing "bodily harm" in the simple battery statute as "some sort of physical pain or damage to the body, like lacerations, bruises or abrasions"). See also *People v. Figures*, 216 Ill. App. 3d 398, 401 (1991) ("Because great bodily harm requires an injury of a graver and more serious character than ordinary battery, simple logic dictates that the injury must be more severe than that set out in the *Mays* definition.").

¶ 35    Defendant's blanket assertion that bruises and abrasions cannot constitute great bodily harm is without merit. See *People v. Cisneros*, 2013 IL App (3d) 110851, ¶¶ 18-20 (noting that the supreme court's discussion of battery in *Mays* was not useful in distinguishing simple battery from aggravated battery because the *Mays* court did not discuss aggravated battery); see also *People v. Thompson*, 2021 IL App (1st) 182371-U, ¶ 30 (agreeing with *Cisneros* that "while minor lacerations such as a small cut to a finger caused by a kitchen knife do not rise to the level of great bodily harm, other lacerations may rise to such a level if sufficient evidence is presented as to their severity").[2]

¶ 36    The record does not support defendant's argument that T.J.'s injuries were "nothing more" than lacerations, abrasions, or bruises. On the contrary, the evidence established that the injuries she sustained caused T.J. to lose consciousness, bleed profusely, and resulted in "massive swelling" to the left side of her face. See *People v. Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶¶ 18-19 (considering the description of the violent attack and subsequent injuries, and quantity of

---

[2] Under Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2021), unpublished orders entered on or after January 1, 2021, may be cited for persuasive purposes.

blood caused by the injuries in finding great bodily harm occurred). The absence of medical testimony regarding the severity of T.J.'s injuries does not preclude the factfinder from finding great bodily harm. See *Cisneros*, 2013 IL App (3d) 110851, ¶ 21. A rational trier of fact could have found that the evidence was sufficient to find defendant guilty of aggravated battery beyond a reasonable doubt. See *Belknap*, 2014 IL 117094, ¶ 67.

¶ 37    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 38    Affirmed.