# Illinois Official Reports

## Appellate Court

---

**_People v. Braswell_, 2019 IL App (1st) 172810**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMAL BRASWELL, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-17-2810 |
| Filed | December 26, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-05022; the Hon. Ursula Walowski, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Jonathan Pilsner, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Brian A. Levitsky, and Ahmed Islam, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Presiding Justice Gordon and Justice Reyes concurred in the judgment and opinion. |

¶ 1      Following a bench trial, defendant Jamal Braswell was found guilty of armed robbery with a firearm and unlawful restraint,[1] then sentenced to a term of imprisonment of 21 years. On appeal, defendant contends that the court erred in denying his motion to suppress where the Arlington Heights police did not have probable cause to arrest him. He further asserts that the court erred in finding that the State proved he was armed with a firearm at the time of the offense where the witness did not sufficiently describe the firearm and the court instead relied on her subjective belief that defendant had a firearm. Defendant maintains that his conviction should therefore be reduced to simple robbery. For the reasons that follow, we affirm the judgment of the circuit court of Cook County.

¶ 2                          I. BACKGROUND
¶ 3                          A. Motion to Suppress
¶ 4      Prior to trial, defendant filed a motion to quash his arrest and suppress evidence. In his motion, defendant contended that on March 6, 2014, he was approached by two officers who had "prior knowledge that defendant had an investigative alert for his arrest." Defendant asserted that the arrest was made without a warrant and his conduct prior to the arrest did not constitute probable cause for an arrest. Defendant noted that after his unlawful arrest, he was placed in a lineup. Defendant sought to suppress his identification in the lineup. In arguing on defendant's motion, defense counsel explained that two women were arrested in an Arlington Heights Mariano's grocery store on suspicion of passing counterfeit bills. Police also arrested a third person inside the store who police believed was monitoring the two women passing the counterfeit bills. Defense counsel further stated that after speaking to the three people, they learned that they travelled to the store together in a vehicle that was parked in the parking lot. Police discovered two other individuals in the parked vehicle, one of whom was defendant. All five individuals were detained and transferred to the police station. The Arlington Heights police officers later learned that there was an investigative alert from May 2013 for defendant from the Chicago Police Department (CPD). The Arlington Heights police officers informed the CPD that defendant was in custody. The CPD officers picked up defendant and placed him under arrest for an armed robbery that occurred in March 2013. Defense counsel argued that there was no probable cause to arrest defendant in connection with the passing of counterfeit bills and there was also no probable cause for the Arlington Heights officers to hold defendant until the CPD arrived to arrest him.

¶ 5      Arlington Heights investigator Eric Sloan testified that when he arrived at work on March 6, 2014, he was informed that patrol units had been dispatched to Mariano's because there was an "ongoing active fraudulent activity investigation." Investigator Sloan explained that in the days leading up to this incident, other police departments in the area were circulating information that there was fraudulent money being passed at Mariano's grocery stores. The day before, the loss prevention team at the Arlington Heights Mariano's informed the Arlington Heights Police Department that individuals had passed counterfeit money at the grocery store.

---

[1]The trial court merged the aggravated unlawful restraint count into the armed robbery count.

¶ 6        Investigator Sloan learned that on March 6, 2014, the loss prevention team at the Arlington Heights Mariano's called the Arlington Heights Police Department regarding two individuals attempting to use counterfeit bills. Two Arlington Heights police officers responded to the call and arrested three individuals inside the store, two attempting to pass the counterfeit bills and one monitoring them, and two individuals, including defendant, in a vehicle parked outside. Investigator Sloan testified that the officers who responded to the call "learned there was a vehicle in the parking lot in which [defendant] was located" and the "five subjects in total had come to the location in that vehicle." Investigator Sloan testified that defendant was not in the Mariano's and did not attempt to use any counterfeit bills that day in Mariano's, but he was seated in the vehicle in which the other individuals had driven to the grocery store. At the police station, defendant provided the officers with a fake name, but he had no identification. Accordingly, the officers conducted a fingerprint inquiry, which revealed defendant's identity.

¶ 7        The officers then conducted a computerized inquiry, which revealed that there was an investigative alert for defendant for armed robbery in Chicago. Investigator Sloan contacted Chicago police Detective Steven Buglio who had entered the investigative alert and notified him that defendant was in custody. Sloan continued to investigate defendant and questioned him and the woman who was found in the vehicle with him. The woman told Investigator Sloan that she was defendant's girlfriend and that defendant was the organizer of the counterfeit money scam. Despite this information, at the conclusion of his investigation, Investigator Sloan determined that defendant would not be charged for anything related to the counterfeit money scheme. Investigator Sloan therefore turned defendant over to Detective Buglio, who had arrived at the Arlington Heights police station to retrieve defendant before Investigator Sloan had concluded his investigation.

¶ 8        Detective Buglio testified that on March 19, 2013, he was assigned to investigate an armed robbery that occurred at a currency exchange on South Ashland Avenue in Chicago. When he arrived on the scene, he spoke to Rosalva Acosta, who told him about the armed robbery. Acosta described three offenders, one of whom was the person who had the gun. Acosta gave Detective Buglio a physical description of the gunman, and there was a video that showed an image of him. The gunman did not have a mask and was wearing a dark jacket with a white stripe on it. Detective Buglio also reviewed surveillance footage from nearby police observation device cameras. A witness also came forward and provided Detective Buglio with information regarding the license plate for a vehicle that was parked near the currency exchange at the time of the robbery. Detective Buglio learned that the vehicle was a Ford Explorer with a temporary license plate from Wisconsin. Detective Buglio contacted the Wisconsin authorities and informed them of the CPD's interest in the vehicle.

¶ 9        Detective Buglio later learned that the vehicle was involved in an unrelated incident in Wisconsin. Detective Buglio and his partners went to Wisconsin to examine the vehicle and take photographs. Detective Buglio noted that the vehicle had some distinctive markings, which they associated with the ABLA Homes[2] area. Detective Buglio observed the vehicle on surveillance footage driving into the ABLA Homes complex in the early morning hours on the day of the robbery. He then observed the occupants of the vehicle enter a nearby CVS. One of

---

[2]ABLA Homes was a Chicago Housing Authority public housing development on the near west side of Chicago.

the occupants was wearing the same jacket worn by the gunman at the currency exchange robbery.

¶ 10     Detective Buglio then went to the CVS and obtained the surveillance footage from the day of the robbery. The footage showed the gunman wearing the jacket. One of Detective Buglio's partners recognized defendant from the neighborhood as the man in the jacket. Detective Buglio generated a photograph array and showed it to Acosta who identified defendant as the gunman. Detective Buglio then generated the investigative alert so that he would be aware if defendant were stopped by the police. Detective Buglio testified that an investigative alert is a notice to the police authorities that "a subject is wanted for something." Detective Buglio later learned that defendant's two co-offenders in the armed robbery had been detained and had given handwritten statements about the incident. Both statements implicated defendant in the armed robbery.

¶ 11     In March 2014, Detective Buglio was contacted by officers from the Arlington Heights Police Department who informed him that defendant was in their custody on an unrelated matter. After the Arlington Heights police concluded their investigation of defendant, Detective Buglio placed him under arrest. Afterward, defendant was placed in a lineup, and Acosta identified him as the gunman at the robbery. Detective Buglio testified that he conducted a lineup because when Acosta identified defendant in the photo array, she said she needed to observe the offender in person to be sure of his identity.

¶ 12     In ruling on defendant's motion, the trial court observed that there was no indication that defendant was in the store passing counterfeit bills but noted that this was part of an ongoing investigation on the part of the Arlington Heights Police Department with regard to the use of counterfeit money in Mariano's grocery stores. The court found the investigation of defendant at the Arlington Heights Police Department "was not any violation of any Fourth Amendment rights or warrant suppression." The court noted that it was an ongoing investigation and the three individuals in the store were in the same vehicle with defendant. With regard to the investigative alert, the court described the process Detective Buglio undertook in order to identify defendant as the gunman and considered the co-offender's statements implicating defendant in the robbery. The court found that there was probable cause for the investigative alert. The court therefore denied defendant's motion to suppress.

¶ 13                                             B. Trial

¶ 14     At trial, Acosta testified that in March 2013, she was employed at a currency exchange on 21st Street and Ashland Avenue. She arrived for work shortly before 8 a.m. that day and noticed three black males coming toward her as she was entering the building. After she entered the currency exchange, she noticed that one of the three black males had entered the store behind her. She informed him that the currency exchange was not open yet, but he told her that they were "here for the money." Defendant then came into the store with a gun "[a]nd he cocked it at that point." Defendant was standing "inches" away from her. Acosta asked them to not hurt her, but defendant told her that they were not "playing" and they wanted the money. The two men directed Acosta to the back room of the currency exchange, which contained the vault where the money was kept. Defendant followed her and kept the gun to her back.

¶ 15     Acosta opened the vault, and defendant started taking money from the vault and putting it into a bag. At one point, defendant stood up and went to speak with the first man who had entered the currency exchange. Once defendant walked out of the back room, Acosta closed

the door behind him and locked it. A third black male then entered the currency exchange, they "exchanged words," and then all three men fled out of the building. Acosta pushed the silent alarm button, informed security about the robbery, and then called the police. When the police arrived, Acosta described the offenders to them. Acosta was able to identify defendant because he was the only one not wearing a mask, although he had a hood on over his head. Acosta testified that there was enough lighting in the currency exchange to clearly observe defendant's face. Acosta observed his "face features" and noticed that he was wearing a black jacket with white stripes on the arms and had dreadlocks.

¶ 16       Detective Buglio contacted Acosta about three weeks later and showed her a series of photographs of different individuals. Acosta identified defendant in the photograph array as the second black male who entered the currency exchange with a gun. Acosta also identified defendant in photographs from the currency exchange's surveillance camera system. A year later, Detective Buglio contacted Acosta again and asked her to meet with him at the police station. There, she viewed a physical lineup and identified defendant as the individual involved in the robbery in March 2013.

¶ 17       Heriberto Tafolla testified that at around 7:40 a.m. on March 19, 2013, he was sweeping the sidewalk on the 1500 block of West Cullerton Street when he noticed a black truck carrying three black males. Tafolla thought the vehicle was suspicious so he went inside and wrote down the license plate number. A few days later, the CPD contacted Tafolla and he provided the officers with the license plate number and a description of the vehicle.

¶ 18       Detective Buglio testified consistently with his testimony at the hearing on defendant's motion to suppress. He further testified that when he showed Acosta the photo array, she said she would have to observe the individual in person to be positive that it was defendant. He testified that "she didn't want to judge it just on the photo" but noted that her identification of defendant in the photo array was not tentative. Chicago police Sergeant John Considine testified that he recognized defendant in the video surveillance footage. He testified that he had "contact with [defendant] on different occasions" during his time with the CPD.

¶ 19       Following closing argument, the court found that the State had proved defendant guilty of robbery beyond a reasonable doubt but deferred its ruling on whether the State had proven the use of a firearm for the charge of armed robbery beyond a reasonable doubt. At a subsequent court date, the court found that the State met its burden. The court noted that Acosta was convinced that defendant had a firearm and made statements to the defendant about not hurting her. The court concluded that Acosta obviously believed that defendant had a firearm. The court also noted that Acosta testified that she was very close to the firearm and referred to defendant "cocking" the firearm. Accordingly, the court found that the State had proved defendant guilty of armed robbery with a firearm and aggravated unlawful restraint beyond a reasonable doubt. The court subsequently sentenced defendant to a term of imprisonment of 21 years, the minimum allowable by statute.

¶ 20                                              II. ANALYSIS
¶ 21       On appeal, defendant contends that the court erred in denying his motion to suppress because the Arlington Heights police did not have probable cause to arrest him. Defendant asserts that there was no evidence presented showing that defendant had been in the store passing counterfeit currency and the State failed to present evidence showing probable cause for his arrest. Defendant also contends that the evidence presented was insufficient to prove

that he was armed with a firearm when he committed the currency exchange robbery. Defendant asserts that there was no firearm introduced at trial and that the court improperly relied on Acosta's subjective belief that defendant had a firearm. Defendant contends that his conviction should therefore be reduced to simple robbery and that we should remand the cause for resentencing.

## A. Motion to Suppress

Defendant first contends that the court erred in denying his motion to suppress. Defendant asserts that the only testimony about the Arlington Heights arrest came from Investigator Sloan, who never explained defendant's connection to the people inside the Mariano's passing the counterfeit currency. Defendant maintains that he therefore established a *prima facie* case that his arrest was illegal and the burden then shifted to the State to prove that the arrest was supported by probable cause. Rather than focusing on this burden, defendant asserts that the State instead focused on the currency exchange robbery that resulted in the investigative alert. Defendant contends that because the Arlington Heights officers did not have probable cause to seize him at Mariano's, the later discovery of the investigative alert could not cure that illegal seizure. Defendant maintains that without the illegal seizure, he never would have been turned over to Detective Buglio and Acosta never would have identified him in the lineup. Defendant contends that the court therefore erred in denying his motion to suppress and should have suppressed his identification by Acosta at the lineup.

### 1. *Standard of Review*

Our review of the trial court's ruling on defendant's motion to quash arrest and suppress evidence presents questions of both fact and law. See *People v. Luedemann*, 222 Ill. 2d 530, 542-43 (2006). The trial court's factual findings are given great deference and will not be disturbed on review unless they are against the manifest weight of the evidence. *People v. Burns*, 2016 IL 118973, ¶ 15. However, the court's ultimate ruling on the motion is a question of law, which we review *de novo*. *Id.* ¶ 16. At a hearing on a motion to quash and suppress, the trial court is responsible for determining the credibility of the witnesses, weighing the evidence, and drawing reasonable inferences therefrom. *People v. Ballard*, 206 Ill. 2d 151, 162 (2002).

### 2. *Probable Cause*

Probable cause for an arrest exists "when the totality of the facts and circumstances known to the officer is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime." (Internal quotation marks omitted.) *People v. Rodriguez-Chavez*, 405 Ill. App. 3d 872, 875 (2010). Here, the facts known to the law enforcement officers at the time showed that there was a counterfeit money scheme being conducted at Mariano's grocery stores. Inspector Sloan testified that three individuals were inside the store and defendant and a woman were in a vehicle in the parking lot. Inspector Sloan testified that the "five subjects in total had come to the location in that vehicle." Under these circumstances, the facts known to the officers were sufficient to lead a reasonably prudent person to believe that defendant had committed a crime.

Defendant contends, however, that defendant's connection to the three individuals inside the store was never explained and in his reply brief directly challenges the State's contention

that there was evidence in the record that the five individuals arrived to the Mariano's in the same vehicle. Defendant asserts that Inspector Sloan did not testify that the other three individuals travelled to the Mariano's in the same vehicle and, in fact, such a contention appears nowhere in the record. Despite defendant's protestations, Investigator Sloan did, in fact, testify that the "five subjects in total had come to the location in that vehicle." In addition, in arguing on the motion to suppress, defense counsel stated that "Arlington Heights police officer's [*sic*] spoke to the two ladies and the man detained inside the store and learned that they travelled together in a car. That car was parked in the parking lot. And that there were two other individual's [*sic*] in the car in the parking lot. One of the individual's [*sic*] seated in the car in the parking lot was [defendant.]" Thus, not only did Investigator Sloan testify that all five individuals arrived at the Mariano's together in the same vehicle, defense counsel acknowledged as much in her argument.

¶ 29        Defendant nonetheless asserts that the officers lacked probable cause to arrest him because there was no suggestion that he was inside the Mariano's or attempted to pass counterfeit money. Probable cause to arrest can exist, however, where defendant was accountable for the criminal conduct of others. See, *e.g.*, *People v. Smith*, 258 Ill. App. 3d 1003, 1017-18 (1994). Because the police had established defendant's connection to the individuals inside the grocery store using the counterfeit bills, they had sufficient facts that would lead a reasonable person to believe that defendant had participated and was responsible or accountable for the commission of a crime. *Id.* at 1018.

¶ 30        We find the circumstances in this case readily distinguishable from *People v. Carnivale*, 61 Ill. 2d 57 (1975), cited by defendant. In *Carnivale*, three defendants were arrested, but Chicago police officers only possessed search warrants for two of the defendants. *Id.* at 57-58. The two defendants were arrested in a hotel lobby. *Id.* at 58. The third defendant was also in the hotel lobby, but the police did not have a warrant for his arrest or a warrant to search him. *Id.* The three defendants were charged with various gambling offenses. *Id.* The circuit court granted the third defendant's motion to quash arrest and suppress evidence finding that there was no probable cause to arrest him. *Id.* The supreme court affirmed that ruling, finding that the third defendant's "mere presence in the same hotel lobby with the other two defendants whom the police suspected of gambling activities did not justify his arrest." *Id.*

¶ 31        Defendant asserts that the same result is warranted here where defendant's "mere presence" in the vehicle did not justify his arrest. Although defendant is correct that a suspect's presence near a crime scene, standing alone, is insufficient to establish probable cause, the defendant's location both before and after the commission of a crime "may properly be considered as factors in determining" whether the police had probable cause to arrest defendant. *People v. Sims*, 192 Ill. 2d 592, 617 (2000). Here, defendant was not merely in a vehicle parked in the grocery store's parking lot that happened to be near where the offenders were passing counterfeit bills. Rather, he was in the same vehicle that the three offenders used to travel to the grocery store and the vehicle the offenders were presumably going to use to leave the store after committing the crime. Although his mere presence in a vehicle in the parking lot, standing alone, was insufficient to justify his arrest, his location may properly be considered a factor in determining whether probable cause existed and the other factors presented, as outlined above, were such that a reasonable person could believe that defendant had participated and was responsible or accountable for the commission of a crime. Accordingly, we find that the circuit

court did not err in denying defendant's motion to suppress.

¶ 32                            3. *Harmless Error*

¶ 33     Even assuming the court erred in denying defendant's motion, we would find any such error harmless. An error is harmless where the result of the trial would have been the same absent the error. *People v. Melton*, 2013 IL App (1st) 060039, ¶ 49. Defendant asserts that the error was not harmless because Acosta testified that when she identified defendant in the photo array, she was not sure if he was the offender and needed to observe him in person to be sure. Defendant asserts that her identification was the "key evidence" that convicted defendant. We do not find this argument persuasive.

¶ 34     Initially, we observe that Acosta did not testify that she was unsure of defendant's identity when she observed the photo array. Rather, in response to defense counsel's questioning, she testified that she did not recall any such uncertainty. In fact, it was Detective Buglio who testified that he conducted a lineup because when Acosta identified defendant in the photo array, she said she needed to observe the offender in person to be sure of his identity. The trial court also tangentially addressed this issue in its ruling, finding that Acosta clearly identified defendant in court. "[S]he looked right at the defendant and she identified him in court." The court also noted that defendant was "inches" away from Acosta during the robbery and her attention was focused on defendant because he had a firearm and she asked him to not hurt her. The lineup identification was thus not the "key evidence" in defendant's conviction. Acosta identified defendant in the photo array and identified him in court as the offender. Sergeant Considine also testified that he recognized defendant in the video surveillance footage because he had "contact with [defendant] on different occasions" during his time with the CPD. Defendant's identity was thus adequately established even without the lineup identification that defendant sought to suppress and the result at trial would have been the same absent any alleged error. We thus find that there was no error in the trial court and that any claimed error on the part of the trial court in denying defendant's motion to suppress would have been harmless.

¶ 35                          4. *Investigative Alerts*

¶ 36     Finally, we must address this court's recent jurisprudence concerning investigative alerts. As noted, Detective Buglio issued an investigative alert for defendant after voluminous evidence indicated defendant's involvement in the currency exchange robbery. Arlington Heights police discovered that investigative alert after defendant's arrest, which led to defendant being turned over to Detective Buglio and his subsequent identification by Acosta at the lineup. Defendant did not contest the propriety of the investigative alert in his motion to suppress or in his opening brief before this court. However, defendant raised the issue regarding the constitutionality of investigative alerts in his reply brief after a divided panel of this court issued its opinion in *People v. Bass*, 2019 IL App (1st) 160640. The majority in *Bass* concluded that an arrest is unconstitutional when it is based solely on an investigative alert, even where the investigative alert is supported by probable cause. *Id.* ¶ 43. In reaching that conclusion, the majority found that the Illinois Constitution required a warrant, based on probable cause, to issue before an arrest could be made and that an investigative alert, validating an arrest without the issuance of a warrant, violated the Illinois Constitution. *Id.* ¶ 62.

¶ 37    Defendant contends that *Bass* controls in this case and terms it a "full-bore judicial rejection" of investigative alerts. We decline to follow the reasoning or precedent of *Bass* and find that *Bass* was incorrectly decided. Rather, we choose to adopt the view outlined by Justice Mason's partial dissent in that case. Setting aside issues raised by the dissents in *Bass* regarding the majority's decision to *sua sponte* address the constitutionality of investigative alerts (*id.* ¶ 110 (Mason, J., concurring in part and dissenting in part); *id.* ¶ 126 (Coghlan, J., dissenting)),[3] we disagree with the majority's finding that investigative alerts are contrary to the mandates of the Illinois or United States Constitutions.

¶ 38    In *Bass*, the majority based its decision on the notion that the CPD improperly utilized investigative alerts in an effort to circumvent the process of obtaining a warrant and arrest individuals without establishing probable cause to do so. *Id.* ¶ 62 (majority opinion). The majority emphasized that its holding rested on the "structure of the investigative alert system." *Id.* ¶ 68. It is unclear, however, what the majority relied on in determining the "structure of the investigative alert system." There was no citation to authority or testimony as to how the investigative alert came into being in *Bass*. Without any documentary or evidentiary support, the *Bass* majority noted that the investigative alert system "parallels the warrant system," and allows law enforcement to obtain "warrant-like documents" but without the "safeguard that the framers of the Illinois Constitution found most important—an affidavit presented to a neutral magistrate." *Id.*

¶ 39    The flaw in the majority's reasoning was correctly identified by the two dissenting opinions in that case. That is, that arrests must be based on probable cause, not warrants as the majority in *Bass* suggests. For example, section 107-2 of the Code of Criminal Procedure of 1963 permits a police officer to arrest a person when "[h]e has a warrant commanding that such person be arrested" or "*[h]e has reasonable grounds to believe that the person is committing or has committed an offense*." (Emphasis added.) 725 ILCS 5/107-2(1)(a), (c) (West 2014). Thus, a police officer may arrest an individual without a warrant where the officer reasonably believes that the person is committing or has committed an offense. In other words, when they have probable cause to do so. *Rodriguez-Chavez*, 405 Ill. App. 3d at 875. The majority in *Bass* suggests, however, that even where a police officer has probable cause to arrest an individual, such arrest is unconstitutional if any police agency has issued an investigative alert. This creates the somewhat paradoxical situation where police may arrest an individual without a warrant and without an investigative alert if they have probable cause to do so, but that same arrest becomes unconstitutional if police issue an investigative alert based on the same facts that gave rise to the probable cause. In other words, the investigative alert must have a proper basis to show probable cause. This inconsistency was identified by Justice Mason in her dissent in *Bass*, 2019 IL App (1st) 160640, ¶ 120 (Mason, J., concurring in part and dissenting in part) ("And I can perceive no principled basis on which to hold that police may arrest an individual without a warrant and without an investigative alert as long as they have probable cause, but if they issue an investigative alert based on the same facts giving rise to probable cause, they have run afoul of the Illinois Constitution."), but not acknowledged by the majority in its

_____

[3]Justice Mason filed an opinion dissenting in part and concurring in part with the majority's judgment. Following Justice Mason's retirement, Justice Coghlan replaced Justice Mason on the panel. After being added to the panel, Justice Coghlan adopted Justice Mason's dissent and also dissented from the majority's supplemental opinion on denial of rehearing.

response to her dissent (*id.* ¶¶ 86-95 (majority opinion)). Accordingly, we disagree with the majority in *Bass* and find that the law enforcement officers' use of an investigative alert in this case did not run afoul of the Illinois Constitution.

¶ 40                                    B. Sufficiency of Firearm Evidence

¶ 41        Defendant next contends that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that defendant was armed with a firearm during the robbery. Defendant points out that the only evidence regarding the firearm came from Acosta, who did not offer any details about the firearm, such as the type of firearm, the color, or the shape. Defendant asserts that the trial court erred in giving too much deference to Acosta's subjective belief that defendant had a firearm, rather than the objective evidence presented. Defendant contends that we should reduce his conviction to simple robbery and remand for resentencing.

¶ 42        At trial, Acosta testified that after the first offender came into the currency exchange, defendant entered with a gun. Defendant then "cocked" the gun, and Acosta asked them to not hurt her. Defendant was standing "inches" away from her. During closing argument, defense counsel argued that the State had failed to prove defendant's use of a firearm beyond a reasonable doubt. Prior to issuing its ruling, the court addressed defense counsel's contention stating that it found Acosta to be a credible witness. Observing a person cocking a gun is not a subjective manifestation of one's thought process; it is an objective event viewed by the observer.

¶ 43        After the trial court entered its ruling, defendant filed a motion for a new trial, again contending that the State failed to prove that defendant used a firearm during the commission of the robbery beyond a reasonable doubt. In denying that motion, the trial court noted that Illinois precedent did not require the State to prove that the alleged firearm is an actual firearm. The court acknowledged that there were no specific facts about the firearm presented in this case but found that Acosta's testimony was credible and reasonable. The court observed that Acosta was "clear that what she saw the defendant point at her was a weapon and I found that she had—was credibility [*sic*] as to her opportunity to observe everything and describe what happened to her." Thus, the trial court found that the State had sufficiently proven the use of a gun beyond a reasonable doubt based on Acosta's credible testimony. It is axiomatic that, in a bench trial, the credibility of the witnesses and the weight to be given their testimony is a matter for the trial court. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). A reviewing court must allow all reasonable inferences from the record in favor of the prosecution and will not overturn the decision of the trier of fact unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011); *People v. Smith*, 185 Ill. 2d 532, 542 (1999). Here, we find that Acosta's testimony regarding the firearm was not so unreasonable, improbable, or unsatisfactory that it raised a reasonable doubt that defendant used a firearm during the robbery.

¶ 44        Defendant contends, however, that this contention is not an attack on Acosta's credibility but rather a contention that the court erred in placing too much emphasis on Acosta's subjective belief that defendant was using a firearm. In support of that argument, defendant relies on *People v. Ross*, 229 Ill. 2d 255 (2008). In *Ross*, the defendant was convicted of armed robbery. *Id.* at 258. The victim testified at trial that he was walking home when he encountered defendant, who demanded his wallet and pointed " 'a black, very portable gun' " at him. *Id.* The victim added that the gun was " 'small' " and " 'something you can conceal.' " *Id.* Based

on the additional evidence presented, the gun turned out to be a pellet gun. *Id.* Nonetheless, the trial court found that the State had proved beyond a reasonable doubt that the gun was a dangerous weapon because the victim clearly believed it was a dangerous weapon. *Id.* at 258-59. On appeal, this court found that the State failed to prove beyond a reasonable doubt that the pellet gun was a dangerous weapon, as required by the armed robbery statute (720 ILCS 5/18-2(a) (West 1998)) in effect at the time of the offense. *Ross*, 229 Ill. 2d at 260. The supreme court affirmed, noting that the State never presented the gun or photographs of the gun into evidence. *Id.* at 277. The supreme court stated that the "trial court incorrectly based its ruling on the subjective feelings of the victim, rather than the objective nature of the gun." *Id.* The supreme court therefore found that the State had failed to prove that the gun was a dangerous weapon beyond a reasonable doubt. *Id.*

¶ 45        Defendant asserts that the reasoning in *Ross* is applicable here because the trial court incorrectly based its ruling that defendant used a firearm on the subjective feelings of Acosta. However, we find that the situation in this case is distinguishable from *Ross*. In that case, the question presented was whether the weapon used by the defendant was a "dangerous weapon." *Id.* at 274. The supreme court found that it was not a dangerous weapon because the State did not present evidence that the gun was loaded and operable or that the gun was capable of being used as a club or bludgeon. *Id.* at 276. The evidence presented showed that the "gun" was actually a small BB gun with a three-inch barrel. *Id.* at 276-77. Thus, the evidence presented "actually precluded a finding that the 'gun' used by the defendant was a dangerous weapon." *People v. Washington*, 2012 IL 107993, ¶ 34. There was no such preclusive evidence presented in this case. Rather, we find that the circumstances in this case more closely resemble those present in *Washington*.

¶ 46        In *Washington*, the victim testified that the defendant pointed a gun at him but, as here, did not provide any details regarding the gun. *Id.* ¶¶ 10, 18, 35. Similarly, no gun was entered into evidence, and no gun was ever recovered. *Id.* ¶ 24. The *Washington* court distinguished *Ross*, noting the evidence presented in *Ross* precluded a finding that the gun used by the defendant was a dangerous weapon. *Id.* ¶ 34. In *Washington*, however, the supreme court observed that the victim was abducted in broad daylight and testified that defendant pointed the gun at him, which established that the victim had an "unobstructed view of the weapon defendant had in his possession during the commission of the crimes. [The victim] testified that it was a gun." *Id.* ¶ 35. As such, the court found that given the victim's unequivocal testimony and the circumstances under which he was able to view the gun, the trier of fact could have reasonably inferred that defendant possessed a real gun. *Id.* ¶ 36. The supreme court reaffirmed its finding in *Washington* in *People v. Wright*, 2017 IL 119561, ¶ 76, finding that a court could rely on the testimony of a single eyewitness in finding that the State had sufficiently met its burden of proof.

¶ 47        Here, too, Acosta unequivocally testified that defendant had a gun. She testified that there was sufficient lighting in the currency exchange at the time of the robbery and that defendant was standing "inches" away from her while he held the gun. As the trial court noted, Acosta's attention was particularly focused on defendant because she asked him to not hurt her. As in *Washington*, Acosta thus had an unobstructed view of the weapon defendant had in his possession and testified that it was a gun. Acosta also testified that defendant "cocked" the gun and held it to her back as she led him to the vault. Although Acosta did not provide further details about the gun and no gun was ever recovered or entered into evidence, given Acosta's

unequivocal testimony, which the trial court found credible, a trier of fact reasonably could have inferred that defendant possessed a real gun. *Washington*, 2012 IL 107993, ¶ 36; *Wright*, 2017 IL 119561, ¶ 77. Accordingly, we find that the court did not err in finding that defendant used a firearm in the commission of the robbery and thus the State proved defendant guilty of armed robbery with a firearm beyond a reasonable doubt.

¶ 48                                    III. CONCLUSION
¶ 49        For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 50        Affirmed.