2021 IL App (1st) 170888-U

SECOND DIVISION
December 14, 2021

1-17-0888

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 4658 |
| | ) | |
| WILLIAM MOORE, | ) | Honorable |
| | ) | Angela Munari Petrone, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

ORDER

¶ 1        *Held:* Defendant's convictions for murder and aggravated criminal sexual assault are affirmed. We affirm the trial court's order denying defendant's motion to suppress custodial statements; although the officer arrested defendant pursuant to an investigative alert instead of a warrant, the investigative alert was supported by probable cause and therefore defendant's arrest was valid; trial counsel's performance was not deficient because counsel was not required to file a futile motion to dismiss the aggravated criminal sexual assault charge; the trial court did not err in limiting defendant's cross-examination of certain witnesses; and defendant was not deprived of a fair trial by the prosecution's comments during closing arguments.

¶ 2        Following a retrial after remand from this court, a jury found defendant William Moore guilty of the murder and aggravated criminal sexual assault of Magdalena Idzikowska. The trial court sentenced defendant to life imprisonment without parole for murder and a concurrent term of 30 years' imprisonment for aggravated criminal sexual assault.

¶ 3 On appeal, defendant contends: (1) his custodial statements should be suppressed because the statements he made were the product of an arrest that was based on an investigative alert instead of a warrant; (2) trial counsel was ineffective for failing to seek the dismissal of the aggravated criminal sexual assault charge on statute of limitations grounds; (3) defendant was deprived of the opportunity to mount a meaningful defense; and (4) he was denied a fair trial when the prosecutor made improper comments during closing arguments.

¶ 4 We affirm for the following reasons.

¶ 5 BACKGROUND

¶ 6 On March 4, 2008, defendant was indicted for the murder and aggravated criminal sexual assault of Magdalena in November 2001. A jury found defendant guilty of those charges, and the circuit court sentenced defendant to concurrent, respective terms of life imprisonment without parole and 30 years' imprisonment. However, the appellate court reversed defendant's convictions and remanded the cause to the circuit court for a new trial based on trial counsel's unreasonable failure to object to the admission of other crimes evidence contained in the video of his interrogation. *People v. Moore*, 2012 IL App (1st) 100857, ¶ 59.

¶ 7 Motion to Suppress

¶ 8 On remand, defendant filed a "motion to quash arrest and suppress evidence illegally seized." Defendant alleged he was unlawfully arrested pursuant to an investigative alert instead of a valid warrant. Citing Justice Salone's special concurrence in *People v. Hyland*, 2012 IL App (1st) 110966, ¶ 51, defendant stated the Chicago police department's practice of issuing investigative alerts effectively side-steps judicial review by giving the police arrest warrant power. Defendant also stated he was arrested without probable cause because his conduct prior

to his arrest could not be reasonably interpreted by the arresting officers as probable cause that he committed or was about to commit a crime.

¶ 9    At the hearing on defendant's suppression motion, Sergeant Torres testified on February 5, 2008, she and her partner stopped defendant's car and arrested him based solely on an investigative alert. Torres stated on cross-examination she knew the investigative alert concerned a murder and a positive DNA association. On redirect examination, Torres stated the investigative alert was issued with probable cause to arrest by the detective division and not a magistrate.

¶ 10   Detective Michael Hammond testified he issued the investigative alert in February 2008 after receiving approval from a supervisor, and he described the facts underlying the alert. In May 2004, he questioned defendant about Magdalena's cellphone records, which showed a call between her cellphone and a cellphone number associated with defendant on the night of her murder. During the investigation, defendant initially denied having a cellphone with him that night but then changed his story. Defendant claimed he had the cellphone with him but gave it to his friend Derrick Coleman, who talked to Magdalena. Defendant also stated he never had sex with Magdalena, and he agreed to the collection of buccal swabs, which were sent to the crime lab for analysis. In June 2004, the crime lab reported that defendant's DNA profile matched semen recovered from Magdalena. Then in December 2007, Hammond interviewed Coleman, who denied meeting or talking to Magdalena.

¶ 11   The trial court denied defendant's motion in a written order finding there was probable cause to issue the investigative alert and to arrest defendant.

¶ 12                                Jury Retrial

¶ 13     At retrial in 2016, Wanda Idzikowska testified she last saw her daughter Magdalena on November 24, 2001. Magdalena was 21 years old and lived at home. Wanda and her daughter commuted to work in Magdalena's green Nissan Altima. When they spoke around 7:00 p.m., Magdalena mentioned she might pick up boxes from Dominick's because they were moving. She last spoke with her daughter around 11:00 p.m. but did not see her leave the apartment. The next morning, two police officers came to the apartment and told her Magdalena was killed. Wanda identified her daughter at the medical examiner's office later that day.

¶ 14     Israel Gonzalez testified he was on his way to work at the Marathon gas station on Ogden Avenue, when he noticed a familiar green Nissan Altima parked on a commercial side street by the local mill. The gas station had previously serviced the Nissan, which was driven by a young lady. When he arrived at the gas station, a regular customer from the mill waved him over to the Nissan. There, he saw the lifeless body of the young lady in the back seat. He ran back to the gas station and called 911.

¶ 15     William O'Connor, a forensic investigator, testified he and his partner, Steve Strzepek, arrived at the scene around 10:00 a.m. The victim was lying unclothed on the back seat with her legs outside the car; her underwear and jeans were pulled down to her ankles. There were .40-caliber cartridge casings inside and outside the car and a large amount of blood on the back seat. In addition to the cartridge casings, O'Connor and his partner recovered bullet fragments, blood, and hair. They also photographed the scene and bagged the victim's hands to preserve trace evidence.

¶ 16     Dr. Ponni Arunkumar, the chief medical examiner in Cook County, testified about the victim's autopsy, which was performed by former assistant medical examiner Dr. Kendall Crowns. Dr. Arunkumar reviewed the autopsy protocol prepared by Dr. Crowns, which included

notes and photographs. In Dr. Arunkumar's expert opinion, the victim's death was caused by eight gunshot wounds and the manner of death was homicide.

¶ 17 On cross-examination, Dr. Arunkumar noted Dr. Crowns took vaginal and anal swabs from the victim and sent them to a lab for analysis. Dr. Arunkumar also noted there were no visible injuries to the victim's vagina and anus despite the circumstances surrounding the victim's discovery.

¶ 18 Dr. Arunkumar stated, on redirect examination, the absence of external injuries to the victim's genitalia does not rule out the possibility of a nonconsensual encounter. The doctor explained, "It just means that there were no injuries in the vaginal area. One cannot make a determination of rape based on the presence or absence of injuries."

¶ 19 Raymond Schnoor, a former detective, testified on May 17, 2004 he and detectives Hammond and Pietryla interviewed defendant. With defendant's consent, an evidence technician collected a buccal swab and thumb prints. Subsequently in 2007, Schnoor traveled to NASA headquarters in Cape Canaveral and met with an analyst who tried unsuccessfully to enhance video footage obtained from surveillance cameras near the crime scene. On cross-examination, Schnoor explained NASA was unable to analyze the video footage sooner because of the space shuttle disaster in 2003.

¶ 20 Karen Abbinatti, a forensic scientist, testified in June 2004 she examined the victim's underwear and jeans for the presence of bodily fluids. Neither tested positive for the presence of semen.

¶ 21 Charlotte Word, a lab director at Cellmark, testified she received DNA standards collected from the victim and Juwan Spruill in 2001. She stated the DNA profile identified on the victim's vaginal and rectal swabs excluded Juwan Spruill as a possible source.

¶ 22      Brian Schoon, a forensic scientist, testified in 2004 he developed a DNA profile from the buccal swabs collected from defendant. He also had DNA profiles generated from standards taken from Juwan Spruill and the victim. He compared defendant's DNA profile with the male DNA profile that Cellmark, a DNA testing lab, obtained from the victim's vaginal and anal swabs collected in 2001. He determined the DNA profiles matched. On cross-examination, Schoon stated he also compared defendant's DNA profile with a mixture of DNA profiles that Cellmark obtained from the victim's fingernail clippings and determined the mixture was not suitable for making a positive association with defendant.

¶ 23      Derrick Coleman testified he played dominoes with defendant in 2001. Coleman viewed a photograph of Magdalena and stated he did not recognize her. He added defendant did not introduce him to any women or hand him a phone to speak with any women.

¶ 24      Tamara Colon testified she met defendant in 1997 when they worked at the same grocery store; she was 17 and defendant was in his 40s. They socialized but did not have a romantic relationship. In 1998, Colon left her job at the grocery store to work at Union Health Service where she met Magdalena. Colon kept in touch with defendant and would occasionally go out to dinner with him. Around Sweetest Day in October 2001, defendant visited her at Union Health Service. He brought her a card, flowers, and lunch. Colon rode around with defendant, and they talked for about 25 minutes. Magdalena accompanied them.

¶ 25      On cross-examination, Colon clarified she did not have a physical relationship with defendant. She also mentioned Magdalena was saving up for an apartment with her boyfriend, Juwan Spruill, and Magdalena had more than one cellphone.

¶ 26      Juwan Spruill testified on the Saturday after Thanksgiving in 2001, he and Magdalena spent the day hanging out at his parents' house in Bellwood. Around 10:30 p.m., he went to work

at H&M International and Magdalena went home to her family. At 11:15 p.m., he talked to Magdalena on the phone for a few minutes. Around 2:30 a.m., he took a break and watched a movie with his supervisor, Jaton Brown, because a train derailed. He tried to call Magdalena during his break, but she did not answer. When his shift ended at 6:30 a.m., he went home and slept. In the afternoon, detectives came to the house and informed him that Magdalena was murdered.

¶ 27    Jaton Brown testified he was the night shift supervisor for H&M International in 2001. On the night of November 24, he supervised a small team including Juwan Spruill, who remained onsite for the entire shift.

¶ 28    Cellphone records showed Magdalena called defendant's home phone at 10:13 p.m. on November 23, 2001 and at 3:22 p.m. on November 24, 2001. At 10:59 p.m. on November 24, Magdalena called defendant's cellphone. The call lasted 20 seconds. Magdalena called defendant's cellphone again at 11:05 p.m. This time, the call lasted 23 minutes. No more calls were made from Magdalena's cellphone after that call.

¶ 29    Detective Michael Hammond testified he was assigned to the investigation of Magdalena's death in late 2001. On May 17, 2004, he and fellow detectives interviewed defendant based on phone records showing calls between him and Magdalena on the night of her death. Defendant initially denied any knowledge of Magdalena. When shown her photograph, defendant stated he met Magdalena when he visited Tamara Colon at Union Health Service, and he had no further contact with Magdalena. Although defendant claimed he never owned a cellphone in his entire life, Hammond noticed defendant was wearing a cellphone on his belt. Eventually, defendant admitted he had a cellphone in 2001. Defendant explained he bought the cellphone registered under someone else's name and he could only use it for about a month

before service was cut off. Defendant initially claimed he gave the cellphone to Gregory Johnson before Thanksgiving 2001 and that Johnson had subsequently died. However, defendant changed his story when shown records of calls made to his family home and workplace, and he admitted there was no Gregory Johnson.

¶ 30    Defendant told Detective Hammond he exchanged phone numbers with Magdalena when they met. They talked on the phone several times and Magdalena asked him to introduce her to some "players." On the night in question, Magdalena called him as he was driving with Derrick Coleman. He handed the cellphone to Coleman, who talked to Magdalena about meeting up. He did not speak to Coleman again after dropping him off.

¶ 31    Detective Hammond further testified on February 5, 2008 fellow officers arrested defendant based on the investigative alert that he issued. Hammond and Detective Schnoor interviewed defendant. Portions of the interrogation video were published to the jury. Defendant admitted talking to Magdalena on the phone but maintained he never had sex with her.

¶ 32    The State rested its case in chief and the trial court denied defense counsel's motion for a directed verdict.

¶ 33    Thereafter, Kathleen Gahagan, a former forensic scientist, testified she processed the victim's car for fingerprints. She also found three pairs of sunglasses and a broken cellphone screen.

¶ 34    Kamilah Bowie testified she and Magdalena were good friends. They met working at the same telemarketing company and enjoyed socializing at parties. When Magdalena started dating Juwan Spruill, Bowie and Magdalena spent less time socializing together. Magdalena spent a lot of time with her boyfriend and even tattooed his name on her upper thigh.

¶ 35       Defendant testified he met Magdalena in October 2001 when he visited Tamara Colon at Union Health Service. Defendant described his relationship with Colon as physical and not romantic. According to defendant, Magdalena asked if he had any friends with money and then gave him two phone numbers to reach her. When Magdalena called him several weeks later to follow up, he mentioned his friend Derrick Coleman.

¶ 36       On November 24, Magdalena called defendant at work and said she needed money to move out of her parents' apartment because they did not like her boyfriend. Defendant was unable to talk with Magdalena at the time, so he told her to call back later. After work, defendant played dominoes with Derrick Coleman. He mentioned Magdalena, but Coleman was not interested in meeting her. After playing dominoes, defendant received a call on his cellphone from Magdalena. She asked to borrow $900, but he told her no. When she called him again, he agreed to give her $200 in exchange for sex. Later, Magdalena met defendant at his home, and they had unprotected sex. Defendant paid Magdalena, who left in a hurry. That was the last time he saw her. Defendant admitted he lied to police about not having sex with the victim and lied about his friend, Coleman, talking on the phone to the victim. Defendant testified he lied to police to get their attention off him because detectives told him he would get the death penalty if he had sex with the victim.

¶ 37       After the defense rested, the State called former commander Wayne Wiberg and Detective Hammond in rebuttal. They denied threatening defendant with the death penalty when they questioned him.

¶ 38       During closing argument, the State commented without objection that Magdalena's boyfriend's DNA did not appear in her forensic swabs and "the only person's DNA who

appeared in the vaginal and rectal swabs, excluding [Magdalena] herself, was the defendant's." The jury subsequently found defendant guilty.

¶ 39    Defendant filed a motion for a new trial arguing the trial court erred in denying his suppression motion and restricting his examination of witnesses. The trial court denied the motion after a hearing. Defendant also filed a motion for additional DNA testing of the victim's vaginal and anal swabs because several alleles were not attributed to the primary male profile that Cellmark obtained from those swabs. The trial court denied the motion after noting defendant failed to show any testing methods that were not previously available. This appeal follows.

¶ 40    ANALYSIS

¶ 41    Defendant contends his custodial statements should be suppressed because he was arrested based on an investigative alert and not a warrant. He relies on *People v. Bass*, 2019 IL App (1st) 160640, ¶ 71, *aff'd in part, vacated in part*, 2021 IL 125434, ¶ 34, where a divided panel of this court held an arrest is unconstitutional when based on an investigative alert issued by the Chicago Police Department. The State argues that the portion of the *Bass* decision defendant relies upon has been vacated.

¶ 42    In reviewing a trial court's ruling on a motion to suppress, we will uphold the court's findings of historical fact and credibility determinations unless they are against the manifest weight of the evidence. *People v. Bass*, 2021 IL 125434, ¶ 21. Where, as here, there are no meaningful facts in dispute and the issue involves merely the application of law to undisputed facts, our standard of review is *de novo. People v. Butorac*, 2013 IL App (2d) 110953, ¶ 14; *People v. Love*, 199 Ill. 2d 269, 274 (2002).

¶ 43    Investigative Alerts

¶ 44    In his reply brief, defendant acknowledges our supreme court vacated the portion of *Bass* addressing the constitutionality of investigative alerts; the supreme court resolved the case on narrow grounds and did "not express any opinion on limited lockstep analysis, its application to warrants or investigatory alerts, or the constitutionality of investigative alerts." *People v. Bass*, 2021 IL 125434, ¶ 31. Defendant maintains the appellate court majority in *Bass* correctly decided that warrantless arrests based solely on investigative alerts are unconstitutional even when supported by probable cause.

¶ 45    Defendant's reliance on the appellate court majority opinion in *Bass* is misplaced because the  portion of the opinion analyzing the constitutionality of investigative alerts was vacated by our supreme court. *Bass*, 2021 IL 125434, ¶ 31. Defendant correctly notes *Hyland*, *Jones*, and *Starks* expressed concerns about the use of investigative alerts instead of arrest warrants. However, those decisions merely noted the existence of an issue without deciding it.

¶ 46    Before and after our supreme court's decision in *Bass*, this court has consistently rejected the constitutional challenge that defendant raises here. *People v. Little*, 2021 IL App (1st) 181984, ¶ 63 (citing *People v. Braswell*, 2019 IL App (1st) 172810, ¶ 39; *People v. Simmons*, 2020 IL App (1st) 170650, ¶¶ 62-64; *People v. Bahena*, 2020 IL App (1st) 180197, ¶¶ 59-64; and *People v. Thornton*, 2020 IL App (1st) 170753, ¶¶ 45-50). We agree with this line of cases that hold that a constitutionally permissible arrest can be made pursuant to an investigative alert as long as the alert is supported by probable cause. *Simmons*, 2020 IL App (1st) 170650, ¶ 64 (quoting *Braswell*, 2019 IL App (1st) 172810, ¶ 39).

¶ 47    Here, Detective Hammond's use of an investigative alert to arrest defendant did not violate the Illinois Constitution because it was based on probable cause. When detectives questioned defendant in the investigation of the murder, he denied ever having sex with the

victim. However, vaginal and anal swabs taken from the victim were compared to the DNA standard obtained from defendant, and they matched with a random chance ratio of 1 in 2.8 quintillion unrelated Black individuals. Defendant's DNA was on both the vaginal and rectal swabs. Further investigation showed although defendant initially denied owning a cellphone, records showed several calls were made between the victim's cellphone and a phone possessed by defendant at the time of the victim's murder. Based on the evidence uncovered by detectives in their investigation, including defendant's denials he had sex with the victim and the match of defendant's DNA to the DNA sample attributed to the offender, police had probable cause to arrest defendant when they did, and thus, the arrest pursuant to the investigative alert based on probable cause is valid. See *Simmons*, 2020 IL App (1st) 170650, ¶ 64 (the police had probable cause to arrest the defendant based on an investigative alert); see also *Thornton*, 2020 IL App (1st) 170753, ¶ 50 (probable cause supported the defendant's arrest incident to an investigative alert). Accordingly, we affirm the trial court's order denying defendant's motion to suppress custodial statements.

¶ 48                                    Ineffective Assistance of Trial Counsel

¶ 49        Defendant next contends trial counsel was ineffective for failing to seek the dismissal of the aggravated criminal sexual assault charge on the grounds that the limitations period for aggravated criminal sexual assault had expired when he was charged in 2008 for the November 2001 aggravated criminal sexual assault. Claims of ineffective assistance of counsel are governed by the two-part analysis set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Patterson*, 2014 IL 115102, ¶ 81.

¶ 50        To prevail, a defendant must demonstrate (1) counsel's performance was objectively unreasonable and (2) a "reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." (Internal quotation marks omitted.) *Id.* (quoting *Strickland*, 466 U.S. at 694). Because a defendant must satisfy both parts of the *Strickland* analysis to prevail, we need not reach the issue of prejudice if we find that counsel's performance was not deficient. *People v. Ramirez*, 2018 IL App (1st) 152125, ¶ 15 (citing *People v. Coleman*, 183 Ill. 2d 366, 397-98 (1998)). Also, it is elementary that "[a]n attorney's performance will not be deemed ineffective for failing to file a futile motion." *People v. Stewart*, 365 Ill. App. 3d 744, 750 (2006). "Defense counsel is not required to make losing motions or objections in order to provide effective legal assistance." *People v. Moore*, 2012 IL App (1st) 100857, ¶ 45; *People v. Mercado*, 397 Ill. App. 3d 622, 634 (2009). That is the case here because we find the limitations issue raised by defendant has no merit.

¶ 51    When the offense was committed in November 2001, the applicable statute of limitations for aggravated criminal sexual assault was three years. Defendant therefore argues the statute of limitations for the aggravated criminal sexual assault charge against him expired in November 2004, three years after the offense was committed. Because he was not charged with aggravated criminal sexual assault until 2008, defendant claims he was prejudiced when counsel failed to seek dismissal of the charge.

¶ 52    The State concedes that in November 2001 when the offense was committed, the applicable limitations period to file aggravated criminal sexual assault charges was three years. However, the State claims that the applicable limitations period was extended by the legislature in July 2004, before the expiration of the original 3-year limitations period. Therefore, the State concludes that defendant is subject to the extended limitations period.

¶ 53    At the time the offense was committed in this case, section 3-5, also known as the *general* limitations statute, provided that charges for aggravated criminal sexual assault were

13

required to be brought within three years after their commission, except as extended under section 3-6. See 720 ILCS 5/3-5(b) (West 2000). At that time, section 3-6, also known as the *extended* limitations statute, provided in relevant part that a prosecution for aggravated criminal sexual assault could be "commenced within 10 years of the commission of the offense if the victim reported the offense to law enforcement authorities within 2 years after the commission of the offense." See 720 ILCS 5/3-6(i) (West 2000).

¶ 54    In 2004, by amending the *general* limitations statute, the legislature effectively eliminated the reporting requirement in the *extended* limitations statute in criminal sexual assault cases where the victim was murdered during the offense or within two years after the offense. This amendment became effective July 29, 2004, which was four months *before* the expiration of the original limitations period in this case. The amendment provides that a prosecution may be commenced at any time for "any offense involving sexual conduct or sexual penetration *** in which the DNA profile of the offender is obtained and entered into a DNA database within 10 years after the commission of the offense and the identity of the offender is unknown after a diligent investigation." See 720 ILCS 5/3-5(a)(2) (West 2004) (P.A. 93-834) (eff. July 29, 2004). The legislature expressly stated the amendment applies to circumstances where either "the victim is murdered during the course of the offense or within 2 years after the commission of the offense." See *id.*

¶ 55    In this case, it is undisputed that the DNA of the offender was obtained from samples in the rape kit. The DNA profile of the then-unknown offender was uploaded to the CODIS database in 2002. It is further undisputed that the identity of the offender was unknown in 2002 when the DNA was submitted to the database and the police investigation had not yet identified a suspect. The State argues that the requirements of the statute to extend the limitations period

were therefore present in this case because: (1) the victim was murdered; (2) the offender was unknown when the DNA was submitted; and (3) the DNA of the unknown offender was entered into the CODIS database within ten years of the offense.

¶ 56    Defendant argues police acquired in June 2004 a lab report showing a DNA match between his DNA and the DNA sample of the unknown offender taken from the victim. Defendant claims his identity became known in June 2004, before the effective date of the amended statute in July 2004, therefore the requirement of the amended statute that "the identity of the offender is unknown after a diligent investigation" was not met because as defendant states in his reply brief, "Here, the 2004 amendment applied to circumstances where a [*sic*] DNA was obtained and uploaded and the offender's identity is still unknown through diligent investigation on or after the effective date of July 29, 2004. 720 ILCS 5/3-5(a)(2)."

¶ 57    Defendant maintains the limitations period should be given a prospective application to address only the identification of offenders who are unknown after July 2004. However, we reject defendant's argument as contrary to the law in Illinois because statutory amendments extending limitations periods are considered procedural changes which are applied retroactively to cases where defendant had not acquired the right to dismissal before the effective date of the amendment. "Whether an amendment may be deemed retroactive depends upon whether it relates to substantive rights, or whether it merely affects the remedy or matter of procedure." *Dworak v. Tempel*, 17 Ill. 2d 181, 187 (1959) (citing *Orlicki v. McCarthy*, 4 Ill. 2d 342 (1954)). Generally, amendments relating to substantive rights must be applied prospectively. *Id.* However, amendments that merely affect the remedy or a matter of procedure are generally applied retroactively. *Becharas v. Cummings*, 292 Ill. App. 3d 1105, 1107-08 (1997) (citing *Orlicki*, 4 Ill. 2d at 347–48). Statutes of limitations have been historically classified as procedural

in character and amendments to them have been applied retroactively. *Id.* (citing *Orlicki*, 4 Ill. 2d at 347-48).

¶ 58      By definition, a retroactive law is a "legislative act that looks backward or contemplates the past, affecting acts or facts that existed before the act came into effect." Black's Law Dictionary (11th ed. 2019). When we apply the amendment to section 3-5 retroactively as required by law, we look to the facts of the case as they existed in November 2001. In November 2001, the offender was unknown, the victim was killed, and the unknown offender's DNA was entered into the CODIS database within ten years of the offense. We conclude the requirements of the amended statute were met.

¶ 59      Defendant argues that to apply an extended statute of limitations to his case would be an unjust application of *ex post facto* laws. However, it is well-settled that a defendant is subject to any extensions of a limitations period enacted by the legislature before the running of the original limitations period. *People v. Stone*, 374 Ill. App. 3d 980, 986 (2007). The legislature "can extend the period of limitations as to criminal offenses which occurred prior to the effective date of the change without violating the constitutional prohibition against *ex post facto* laws" if the original limitations period has not expired, which is the case here. *Id.* (quoting *People v. Anderson*, 53 Ill. 2d 437, 440 (1973)). In this case, the amendment was made effective on July 29, 2004, before the original limitations period for charging aggravated criminal sexual assault in this case expired on November 25, 2004.

¶ 60      In *People v. Anderson*, 53 Ill. 2d 437, 440-41 (1973), our supreme court found that a statutory amendment extending a statute of limitations was intended to apply to all cases, except where a defendant had become entitled to discharge prior to the effective date. "[A] legislative body can extend the period of limitations as to criminal offenses which occurred prior to the

effective date of the change without violating the constitutional prohibition against *ex post facto* laws, so long as the extended period does not apply to any case in which the accused has acquired, as of the effective date of the change, a right to acquittal through the running of the original statute." *Id.* Here, the amendment to the general limitations statute became effective in July 2004. At that time, defendant had not acquired a right to dismissal based on the running of the original 3-year limitations period. Accordingly, the amendment applied retroactively to the aggravated criminal sexual assault charge in this case and does not constitute an *ex post facto* law.

¶ 61       Defendant argues the statute of limitations, as it existed when the offense was committed, expired in November 2004 and the prosecution did not plead a basis to extend that period and was therefore defective. Defendant contends trial counsel was ineffective for failing to seek the dismissal of the defective aggravated criminal sexual assault charge. Even assuming trial counsel had filed a successful pretrial motion to dismiss the aggravated criminal sexual assault charge based on the State's failure to plead any exceptions to the statute of limitations in the indictment, the remedy is the dismissal of the charge and not an acquittal. *People v. Gray*, 396 Ill. App. 3d 216, 224 (2009). The State could then amend the aggravated criminal sexual assault charge with any necessary allegations. *Id.*; accord *People v. Frazier*, 2017 IL App (5th) 140493, ¶ 25 (the State would have refiled the charges). The outcome would not have changed. Accordingly, defendant's claim of ineffective assistance of counsel fails. See *People v. Cray*, 209 Ill. App. 3d 60, 65 (1991) (the State's failure to include tolling or extending information in the indictment is a technical error and allows for reindictment).

¶ 62       The plain language of the amendment reflects the legislature's response to circumstances where, as here, the victim was murdered during the commission of the aggravated criminal

sexual assault, and the amendment set forth conditions that "the DNA profile of the offender is obtained and entered into a DNA database within 10 years after the commission of the offense and the identity of the offender is unknown after a diligent investigation." See Pub. Act 93-834, § 5 (eff. July 29, 2004) (amending 720 ILCS 5/3-5(a)).

¶ 63       Under these circumstances, counsel's performance is not deficient for failing to pursue a futile motion. *Stewart*, 365 Ill. App. 3d at 750. Counsel is not required to make losing motions or objections to provide effective legal assistance. See *Moore*, 2012 IL App (1st) 100857, ¶ 45; *Mercado*, 397 Ill. App. 3d at 634. Because defendant's statute of limitations argument has no merit, his claim that he received ineffective assistance of trial counsel necessarily fails.

¶ 64                                            Confrontation Clause

¶ 65       Defendant also contends he was deprived of the opportunity to mount a meaningful defense where the trial court sustained the State's objections to defense counsel asking defendant's girlfriend whether she ever saw defendant with a gun and the medical examiner whether a sexual assault had occurred. He argues the cumulative effect of these errors denied him a fair trial. We disagree.

¶ 66       A defendant has a constitutional right to confront the witnesses against him. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. This includes the right to present a defense. *People v. Hayes*, 353 Ill. App. 3d 578, 583 (2004) (citing *People v. Manion*, 67 Ill. 2d 564 (1977)). Even so, a defendant's rights under the confrontation clause are not absolute. *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 82. The confrontation clause guarantees an opportunity for effective cross-examination but "not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Internal quotations omitted.) *Id.* (citing *People v. Jones*, 156 Ill. 2d 225, 243-44 (1993) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). A trial court has

broad discretion in refusing evidence as irrelevant if it is uncertain or remote in time. *Hayes*, 385 Ill. App. 3d at 583. We review a trial court's limitation of cross-examination for an abuse of discretion. *Johnson*, 2020 IL App (1st) 162332, ¶ 82.

¶ 67    Wanda Hale testified she and defendant were seeing each other in 2001. She had moved to Alabama and kept in touch with defendant. She later returned to Chicago and was living with defendant in 2008 when he was arrested.

¶ 68    The trial court sustained the State's objection when defense counsel asked defendant's girlfriend on cross-examination whether she *ever* saw defendant with a gun. During a sidebar, the trial court explained, "whether the defendant had a gun in front of the woman he lived with that has no bearing and is immaterial to the issue of whether he had a gun with the victim on the date in question." Critically, as the State points out, defense counsel did not ask defendant's girlfriend whether she saw defendant with a gun "around the time of the shooting." Any testimony from defendant's girlfriend about defendant's possession of a gun would be uncertain, remote, and thus irrelevant to the offenses at issue. See *Hayes*, 353 Ill. App. 3d at 584 (proffered testimony about a gun that a witness wanted to sell two months before the shooting was both uncertain and remote to shed light on who brought the gun on the date of the offenses). Accordingly, we cannot say the trial court abused its discretion in sustaining the State's relevancy objection.

¶ 69    The trial court also sustained the State's objection when defense counsel asked Dr. Arunkumar on cross-examination, "Can you say within a medical degree of certainty that a sexual assault occurred based upon the condition of the vagina?" The doctor testified on redirect examination the absence of external injuries to the victim's genitalia does not eliminate the possibility of a nonconsensual encounter. According to the doctor, "It just means that there were no injuries in the vaginal area. One cannot make a determination of rape based on the presence or

absence of injuries." An expert may offer an opinion on an ultimate issue so long as that opinion is not couched as a legal conclusion. *Brettman v. Virgil Cook & Son, Inc.*, 2020 IL App (2d) 190955, ¶ 83. Defense counsel's question called for a legal conclusion from the doctor about whether the victim was sexually assaulted and invited speculation about the absence of injuries. The doctor's testimony in that regard would shed no light on the possibility of a nonconsensual encounter. Accordingly, we cannot say the trial court abused its discretion in sustaining the State's objection to defense counsel's question, nor can we say the trial court denied defendant a fair trial.

¶ 70                                     Prosecution's Closing Argument

¶ 71        Nonetheless, defendant maintains he was denied a fair trial when the prosecution made improper comments during closing arguments. He claims the prosecution falsely told the jury "there's only one set of DNA inside [the victim's] vagina, only one set of DNA inside [the victim's] rectum, and it's not her boyfriend, it's not—it's not the real killer who she must have been going to see, it's the defendant's DNA." He acknowledges his failure to make a contemporaneous objection and asks this court to review the issue under the plain error rule. Before doing so, we must consider whether the prosecutor's comments were reversible error. *People v. Gonzalez*, 388 Ill. App. 3d 566, 587 (2008); *People v. Ali*, 2019 IL App (2d) 161016, ¶ 13.

¶ 72        The prosecution has broad leeway in making closing arguments so long as they are based on the evidence or reasonable inferences drawn from the evidence. *Gonzalez*, 388 Ill. App. 3d at 587. Challenges to the prosecution's comments during closing arguments must be considered in view of the entire closing arguments. *Id.* We will not reverse a jury's verdict based on improper

comments during closing arguments unless they substantially prejudiced defendant and constituted a material factor in his conviction. *Id.*

¶ 73    During closing argument, the State commented without objection that Magdalena's boyfriend's DNA did not appear in her forensic swabs and "the only person's DNA who appeared in the vaginal and rectal swabs, excluding [Magdalena] herself, was the defendant's." The State also commented that the absence of semen on the victim's underwear, which was pulled around her ankles, suggested the DNA recovered from swabs of her vagina and anus originated from the killer. The State further noted defendant claimed he had consensual, unprotected sex with the victim, and defense counsel also argued defendant had consensual sex with the victim. Although defendant finds significance in the presence of several alleles that were not attributed to the primary male profile that Cellmark obtained from swabs of the victim's vagina and anus, the State's comments were based on the evidence adduced at trial and reasonable inferences from that evidence. See *Gonzalez*, 388 Ill. App. 3d at 589 (the prosecutor's remarks were properly supported by the evidence and reasonable inferences drawn therefrom). In view of the entire closing arguments, we find no error in the prosecution's comments; any possible error was not substantially prejudicial and did not constitute a material factor in defendant's conviction.

¶ 74                                CONCLUSION

¶ 75    Accordingly, we affirm defendant's convictions and sentence for the murder and aggravated criminal sexual assault of Magdalena Idzikowska.

¶ 76    Affirmed.